## HARRISON, ADM'R, AND GARDNER, ADM'R, v MOCK, ET AL.

1. A trustee, who accepts the trust, must do all acts which are necessary and proper, for the due execution of the trust; he must act with reasonable diligence, and be vigilant in the discharge of his duties. To entitle him to the protection of the court, he must act as a prudent man would act, in relation to his own property, in those matters where he has a discretion. A trustee who permitted the debtor to retain the possession of the trust estate, waste it, and use it as his own, was held responsible for the injury to the trust fund, out of his own estate.

2. Where one accepts a trust, by which a debtor devotes all his property to the payment of his crediors, the trustee thereby waives any specific *lien*, he may have on the property, by virtue of execution, and must take according to the stipulations of the deed of trust.

3. When a trustee, after the acceptance of the trust, caused a sale of part of the trust property under execution for his own benefit, and became himself the parchaser, he will be considered as having purchased in his character of trustee, for the benefit of those concerned in the trust.

4. In such a case, he will be allowed a credit for the debt extinguished, to be regulated by the provisions of the deed, but cannot have a credit for a debt created between him and the debtor after the deed was made.

5. The trustee cannot claim, that a larger amount is due him, than he sets out in his answer, unless he puts it in issue by an amended answer.

6. When a bill is filed to subject a trustee to liability, for having used, or wasted the trust funds, or for having permitted the debtor to do so, and these acts are charged, it is not necessary to amend the bill, for every fresh malversation of the trustee, after the bill is filed. It is his duty, to put the facts in issue, which justify his conduct.

7. The chancellor may enforce the delivery of property in the possession, or under the control of a party to the suit, but unless such is the case, an attachment is improper, and the party should be charged with their value.

Error to the Chancery Court of Lowndes.

THE bill was filed in June, 1841, by the defendants in error, creditors of William R. Meyer, against R. B. Harrison, to charge him as the trustee of Meyer. The bill sets out the various demands, the evidences of which are appended to the bill as exhibits. That on the 20th April, 1840, Meyer con-

24

veyed by deed all his real and personal estate to R. B. Harrison, upon trust, to take possession of all his property, and as soon as consistent with the interest of the creditors, to sell and pay the debts equally, and rateably. That Harrison accepted the trust, and took possession of the property immediately—has received the income, and has made no appropriation thereof among the creditors—that he has not sold the property, but has placed the slaves on his own plantation, and converted their labor to his own use. That the trust property was sufficient to pay all the debts; yet the trustee has not paid any of them, but has hindered, and delayed the creditors, in the collection of their debts, and pray that he be compelled to discharge them out of his own estate.

The bill also charges mismanagement in the sale of real estate purchased by the sheriff, but as no decree is made upon this part of the bill, affecting the plaintiff in error, it is unnecessary to be stated.

The deed of trust, which is made an exhibit, is as follows:

"Whereas, I, William R. Meyer, of the above State and county, being at present unable to pay all my just debts, am desirous of assigning all my property and effects, of whatever kind, for the purpose of paying my creditors. Therefore be it known, that I, the said William R. Meyer, for and in consideration of one dollar to me in hand paid, by Richard B. Harrison, of the county of Dallas, as well as for other considerations hereinafter expressed, have granted, bargained, sold and conveyed to the said R. B. Harrison, the following described property, to wit: [Here follows a description of the land and slaves.] Also, all my horses and mules; all my stock of cattle and hogs; all my plantation tools of whatever kind; my waggons; all my household and kitchen furniture, and all my corn and fodder. To have and to hold all the above described property to the said R. B. Harrison, and assigns forever. In trust, nevertheless, upon the following conditions, and for the following purposes. The said Harrison to take possession of the said property, and as soon as the same can be done, consistently with the interest of the

creditors of the said W. R. Meyer, to expose the same to sale, and appropriate the proceeds of the sale of said property, or so much as may be necessary, to the payment of the debts due by the said Meyer, on his own account, equally and rateably, without any distinction or preference, and he is further authorized to appropriate the balance, if any there be, after paying the above described debts, for which the said Meyer is liable as security or indorser, equally and rateably, and without any distinction. In testimony whereof, &c. dated 1 April, 1840.

(Signed,)            WILLIAM R. MEYER.

R. B. Harrison, by his answer, denies that all of the debts of the creditors were intended to be provided for in the deed, and says that some of the debts have been contracted since. That among the debts then due, was a debt of $2,000 due himself, and that these debts were intended to be secured by it. Admits that he received the deed of trust from Meyer, and has had it in his possession ever since, but in no other way did he accept the trust. Denies that he ever took possession of the property, or received any of the rents. Says he would have accepted and executed the trust, but for a difficulty about the land. Denies that he has placed the slaves on his plantation, or received the profits of their labor, but says he has given Meyer permission to cultivate one of his plantations, where the slaves are, under the sole control of Meyer, who receives the proceeds of their labor. That Meyer has become indebted to him in the sum of $500 since the deed was executed. That three of the slaves were sold under an execution previously in the hands of the sheriff, and two under a mortgage, &c.

The answer of Meyer is substantially the same. Other answers are also filed, but need not be stated.

Meyer and Harrison both having died, the suit was revived in the name of Kirkland Harrison, administrator of R. B. Harrison, and of Samuel Gardiner, administrator *de bonis non* of Meyer, who answer the bill, adopting the answers of their intestates, and the latter admitting that he had received from his predecessor six slaves, the property of Meyer.

A reference was made to the master, to ascertain the amount of debts due the complainant from Meyer—to take

and report the evidence, and the manner in which Harrison managed, and conducted the trust estate, its value, and the proceeds thereof since the deed was executed.

The master made his report, which was set aside. He subsequently reported, that there was due to Harrison from Meyer,.................................... $1,989 05
To the creditors,....... ....... ..... ......... 10,603 37
That the slaves of Meyer made a crop of cotton in 1843, which was sold by R. B. Harrison for $1,000—that the negroes were hired out in 1844 and 1845, in the latter year for $321. That the average hire of the slaves mentioned in the deed, for 1840-1-2, up to the death of Meyer, (except Prince and Burrell, sold under mortgage,) would be $1,000 per annum. He also took and reported the evidence relating to the acceptance and management of the trust. Exceptions were taken to the report by both parties.

The chancellor considered that the trustee had accepted the trust, and was responsible to the creditors for permitting Meyer to keep possession of, and use the property, and decreed that the register should take an account of the value of the horses, &c. mentioned in the deed; also, of the corn and fodder Meyer had in his possession, at the end of six months from the date of the deed, and conveyed by it, and that the amount with interest should constitute a charge upon the estate of R. B. Harrison. That he should also charge the estate with one thousand dollars per annum, for the hire of the slaves, from the date of the deed to the death of Meyer, with interest. That the sale of the slaves, Jim, Frank and Gustin, and Hagar, Eliza, Nancy and child, Aaron, and the purchase thereof by R. B. Harrison, should be set aside, and the slaves be declared subject to the debts of Meyer. That Gardner, administrator of Meyer, should deliver to the register certain slaves, which he admitted to be in his possession, and that Kirkland Harrison deliver to him the slaves Jim, Frank, Gustin, Hagar, Eliza, Nancy and her child, Aaron, their increase—the slaves to be sold, and Harrison's administrator to pay the costs of the suit.

The administrator of Harrison being required to deliver the slaves according to the decree failed to do so, assigning as a reason that he did not have them in his possession, and

a rule was granted against him to show cause why an attachment should not issue.

The register reported that he had sold the land, and the slaves delivered by Meyers' administrator for $3,899—that the hire of the negroes, and interest thereon was $3780, and the value of the horses, &c. and interest thereon, was $2,-356 73, leaving a balance due from the estate of Harrison of $4,137 68, which was confirmed by the chancellor.

From this decree this writ is prosecuted, and the following errors assigned:

1. In charging the estate of Harrison with the value of the property, other than the negroes and land conveyed by the deed.

2. In charging it with the hire of the negroes.

3. In setting aside the sale of the slaves Jim, Frank, and Gustin, Hagar, Eliza, Aaron, Nancy and child, without a suitable allegation in the bill, and not allowing him the money paid for them.

4. In ordering the slaves Jim, Frank and Gustin to be delivered up by the administrator, when they had never been in his possession, or under his control.

5. In imposing all the costs upon the estate of Harrison.

6. In decreeing upon matters happening after the bill was filed, without a supplemental bill.

7. In referring to the register to report the evidence of the manner in which Harrison had managed the trust estate.

EDWARDS, for the plaintiff in error, made the following points:

1. R. B. Harrison had not, at the time of filing the bill, accepted the trust, and could not at that time be chargeable as a trustee.

2. It was only from the time he consented to act as trustee, that he can be required to account for the property. He is treated with rigor because he did not sell, but the deed did not contemplate an immediate sale. It was to be sold when the interest of the creditors required it. When did that event happen?

3. In setting aside the sale of Jim, Frank and Gustin, sold

on the day of the date of the deed, to other persons, and never were in his possession, or that of his administrators. Also, in requiring the administrator to deliver them up, and in charging for their hire.

4. If the sale was set aside, and hire charged, the debt to satisfy which they were sold, should have gone in extinguishment of that debt. If he is to be charged hire, he should be allowed interest. A portion of these slaves were sold after the bill was filed, there was then no allegation to which the proof applied. [Story's Eq. P. 269.]

The only ground of equity, the gravamen of the bill, was referred to the master, to report the facts.

Thos. Williams, Jr., contra. The answer of the trustee, impliedly, if not in express terms, admits the acceptance of the trust, and the proof on the point is full and complete.

If a trustee accepts the trust, he cannot afterwards, without the consent of the *cestui que trust*, or the direction of the court of chancery, surrender or discharge himself from it. [4 Johns. C. 136.]

A trustee is liable for what he might have made, or recovered without his wilful neglect, or default. [1 Turn. & R. 379; 11 Eng. C. R. 206, S. C.]

If a trustee permit property to remain unproductive in the hands of an insolvent, he is guilty of a breach of trust, or if he permit the property to pass into the hands of a co-trustee, he is liable in case of loss. [6 Johns. C. 16, 452; 1 Hill, S. C. 191.]

If trustee permit funds to be idle, or be guilty of negligence he shall pay interest. [1 Bro. C. C. 384; 3 G. & J. 341: 1 Johns. C. 82, 527, 620; 2 J. J. M. 303; 5 Mass. 332; 4 Dess. 110.]

If trustee holds *liens* previous to execution of trust deed, and he accepts the trust, he cannot sell the property under his *prior liens*. [Hop. C. 515; 7 Johns. C. 174.]

Harrison cannot get the benefit of his demands against Meyer, without presenting and proving them before the register on the reference, and excepting, if his claim is not allowed. [38 Rule C. P. Clay's Dig. 616; 1 Paige 145, 193;

Harrison, &c. v. Mock, et al.

6 Johns. 566; 7 Id. 137; 1 Hill C., S. C. 185; 1 Minor, 35; 7 Ala. 217.] He only claimed in his answer, $2,000 and was allowed $1,989.

For the rule as to payment of costs, he cited 5 Paige, 48, 125; 2 Sim. & Stu. 78; Hop. 344; 3 Paige, 146; 12 Johns. 500; 6 Johns. C. 33, 411 · 1 Id. 82; Jacobs, 574.]

The order of reference was strictly proper, and could not possibly work any injury to Harrison. [11 Eng. C. R. 213-4; 3 Porter, 36; 6 Johns. C. 436; 7 Ala. 217.]

ORMOND, J.—We will first consider, whether the trustee appointed by the deed accepted the trust, and if he did, the duties and responsibilities he thereby assumed, and the consequences of his neglect in their performance.

It is very clear, we think, that the trust created by the deed was accepted by Harrison, the trustee. The whole case shows, that there was great intimacy and confidence existing between him and Meyer. It is not usual to appoint a trustee without consultation with him, and although there is no proof that his consent was previously obtained, it may be fairly inferred from his subsequent conduct that such was the fact. He admits that he received the deed from Meyer, and kept possession of it until he handed it to his counsel. It is also admitted on the record, that he permitted Meyer, from and after the execution of the deed, to keep possession of all the trust property, and to take the crops, and sell and dispose of them as he pleased until his death. In the spring of 1841, one year after the execution of the deed, he promised to sell the property in a few days, and after the bill was filed, told one of the complainants they would have got their money sooner, if they had not filed the bill, but now he would keep them out of it as long as he could. On the 30th January 8, 142, he addressed a letter to Mr. Austill, by which he authorized Meyer to rent the lands, and take a note for the rent to him as trustee. These acts of interference, unequivocally establish his acceptance of the trust, and independent of the natural and inevitable presumption, the admission is made of record, that these acts " were from, and after the execution of the deed." There is then no foundation for the argument, that the acceptance of the trust was at some

subsequent period, from which his liability is to be dated. It is clear that it was cotemporaneous with the deed, and it would be a most unreasonable inference, that he was not fully apprized of the intended execution of the deed, and of his appointment as trustee. It is also evident, that his acceptance of the trust, had the effect of placing the property, beyond the legal pursuit of Meyer's creditors. His duties as trustee, are to be ascertained by the power conferred on him by the deed. They were, "to take possession of the property, and as soon as the same can be done, consistently with the interest of the creditors, to expose the same to sale, and appropriate the proceeds to the payment of the debts." His duty is here set forth, in plain and explicit terms, and having accepted the trust, the law casts on him the obligation of performing it. The creation of the trust placed the property beyond the reach of the creditors by the ordinary means provided by law, and placed the trustee in their stead, and it is not too much to say, that he shall be held to a strict performance of the stipulation, by which alone he acquired the right to interfere between the debtor and his creditors. It was his plain duty, under the deed, as soon as practicable, consistent with the interest of the creditors, to take possession of the property, sell it, and appropriate the proceeds as the deed required. Instead of this, he permits the debtor to keep the property in his own possession, and appropriate the proceeds to his own use, as if the deed had never been made. By this course of procedure, the whole effect of the deed was, to keep the creditors from the pursuit of their debtor, by the means the law had provided. This was a perversion of the trust, to an unjust and improper purpose, and was a plain violation of his duty as trustee. It might be added that it was open and undisguised, as he threatened the creditors to protract the litigation as far as possible.

It is supposed, that it does not appear that the interest of the creditors required an earlier sale. The requirement of the deed was, to take possession, and if any circumstance existed, making an immediate sale improper, it should have been shown. The only excuse offered for not selling is, that there was a difficulty about the title to the land ; but certainly, this was no reason why the debtor should be permitted to

keep the slaves, and other personal property, and use it as his own. The excuse offered, has not the semblance of justification; it rather furnishes a reason why that portion of the property about which there was no difficulty, should have been converted into money.

Having ascertained that there was a violation of duty on the part of the trustee, necessarily injurious to those whose interests he had undertaken to protect, we proceed to consider the consequence to him of such wilful neglect.

It is the duty of a trustee to do all acts which are necessary and proper for the due execution of the trust which he has undertaken—he must act with reasonable diligence, and be vigilant in the discharge of the duties he has assumed. Some discretion he must necessarily have in the performance of his duties, and when he acts in such a manner as a prudent man would act in relation to his own property, he is entitled to the protection of the court. On the other hand, if he omits to act when duty requires him to be active, or if he is wanting in the necessary care, or diligence, he is personally responsible for the consequences. In the recent case of Clough v. Bond, 3 Milne & Craig, 495, Lord Cottenham thus sums up the doctrine on this subject. "It will be found to be the result of all the best authorities on this subject, that although a personal representative, acting strictly within the line of his duty, and exercising reasonable care and diligence, will not be responsible for the failure, or depreciation of the fund, in which any part of the estate may be invested, or for the insolvency, or misconduct of any person who may have possessed it, yet if that line of duty be not strictly pursued, and any part of the property be invested by such personal representative, in funds, or upon securities not authorized, or be put within the control of persons who ought not to be entrusted with it, and a loss is thereby eventually sustained, such personal representative will be liable to make it good, however unexpected the result, however little likely to result from the course adopted, and however free such conduct may have been from any improper motive. Thus, if he omit to sell property when it ought to be sold, and it afterwards be lost, without any fault of his, he is liable, [Phillips v. Phillips,

Freeman C. C. 11," &c., and citing and commenting on many other cases. See also, Oliver v. Court, 8 Price, 127; Lawson v. Copeland, 2 Bro. C. C. 156; Powell v. Evans, 5 Ves. 839; Bacon v. Bacon, Ib. 331; Hanbury v. Kirkland, 3 Simons, 265; Underwood v. Stevens, 1 Merivale, 712; King v. King, 3 Johns. C. 552; Hart v. Ten Eyck, 2 Id. 76; Thompson v. Brown, 4 Id. 619.]

The result of the examination is, that the trustee is justly chargeable with all the property covered by the deed, which has been lost, or destroyed through his negligence, and for the value of the services of the slaves, whilst they remained in the possession of the debtor.

It is also contended by the counsel for plaintiff in error, that the chancellor erred in setting aside the sale of certain slaves, and subjecting them to the satisfaction of the debts of the creditors, and at all events the trustee should have been allowed a credit for the debts of Meyer extinguished by the sale of the slaves.

Three of these slaves, Jim, Frank and Gustin, were, as it appears sold by the sheriff under execution on the same day the deed was executed. These executions were a *lien* on the property conveyed by the deed. It does not appear that the trustee had any control over these executions, or any right to the proceeds of the sale. He did not purchase the slaves at the sale, nor does it appear that they have ever been in his possession, or under his control, and we can see no reason why he should be charged with them. Although they were conveyed to him by the deed of trust, the *liens* created by the executions, had already attached, and he had not, so far as we can judge from the record, any power to prevent the sale.

The slaves Hagar, Aaron, Eliza, Nancy, and her child, stand upon a different footing. They were sold by direction of the trustee, in June, 1842, nearly a year after the bill was filed, to satisfy judgments, which he claimed the right to control, and at the sale he became himself the purchaser. This was a breach of his duty as trustee. The deed devoted the slaves, and other property to the payment of all the creditors, in equal proportions, and he cannot be permitted to do an act beneficial to himself, and injurious to the rest of the cre-

ditors, whose interest he had undertaken by the acceptance of the trust to protect. The sale being made at his instance, and for a purpose not authorized by the deed is voidable.

It does not appear, that the executions under which the sale was made, were *liens* upon the slaves when the deed was executed ; nor are we able to perceive that it would alter the case, if such was the fact. The deed provided for the payment of all the creditors rateably, if the property was not sufficient to pay all, as was the fact here, and by accepting the trust, the trustee consented that his own claim should be thus apportioned. He in effect waived his lien, and consented to come in as a general creditor, except so far as he was preferred by the deed. [Hawley v. Mancius, 7 Johns. C. 184; Rogers v. Rogers, Hop. C. 523.] His purchase, therefore, of these slaves, must be considered to have been made by him in his character of trustee, and for the benefit of those concerned in the trust.

It is further urged, that if these slaves are to be considered a part of the trust fund, the trustee is entitled to a credit for the amount of debt extinguished by the purchase of the slaves. This is doubtless correct, and the answer of the opposing counsel at the bar, that he should have presented his account to the master, is not an answer to the objection, because it does not appear from the record, that he has had the opportunity of doing so, the account which was taken of the debts of Meyer, being previous to the decree ascertaining that this purchase was invalid. But it is to be observed, that as the trust deed provides for the payment of a certain class of creditors in preference to others, if this claim of the trustee did not exist at the time the deed was made, he must be postponed until all the preferred creditors are satisfied. In addition it should be remarked, that the trustee in his answer, states the indebtedness of Meyer to him, at two thousand dollars, when the deed was executed. This is an admission of the extent of the debt at that time, which cannot be contradicted unless by leave of the court an amended answer is filed, putting a larger amount of indebtedness in issue.

It is also contended, that the chancellor had no power to set aside this sale, because it was not put in issue by the

pleadings.   As already observed, this sale was made by
the trustee, after the bill and answer were filed.   The
object of the bill was to charge the trustee, for a breach
of his trust, and charges those acts which were relied on
as constituting such breach—that he took possession of
the property, and has received the product thereof since
the execution of the deed, converting and disposing of
the same to his own use, and has made no division or appro-
priation of the fund.   The design was to hold him responsi-
ble for the property conveyed by the deed, and for its product,
whilst under his control, and we do not think it was either
necessary or proper that a supplemental bill should be filed,
at every fresh malversation of the trustee.   It was his duty,
if he claimed the right to control this property, independent
of the trust deed, to put the facts distinctly in issue.   This
pretended sale, and purchase by himself, was but another
breach of his duty as trustee, and covered by the allegations
of the bill.

It is also objected, that it is contrary to the practice in this
State, to make such a reference as was made in this case to
the master, which was, that the master should report the ev-
dence of the manner in which the trustee managed, and con-
ducted the trust estate.

The inquiries which may be devolved on the master by
the chancellor, are so numerous and diversified, that it is dif-
ficult, if not impossible, in advance to describe or embrace
them, by any general definition.   Nothing however is more
common, or more conducive to the convenience both of the
court and suitors, than to refer to the master the ascertain-.
ment of facts, and this seems to be all that was contemplated
by this order.   But in point of fact, it was inoperative, as
the parties by their counsel admitted that the trustee permit-
ted the debtor, from and after the date of the deed, to keep
possession of the property, and take the profits to his own
use.

There can be no doubt of the power of the chancellor to
enforce the delivery of property in the possession of, or un-
der the control of a party to the suit, by an attachment.   In
this case however, we understand, that the administrator of
the trustee was required to deliver the three slaves, Jim,

Frank and Gustin, which were never under the control of the trustee, but as appears from the testimony, were purchased by, and went into the hands of third persons. For these the trustee was not responsible, and·if he was, as they were in the hands of third persons, no attachment could issue for their non-delivery, but the party should have been charged with their value.

As the cause must be remanded, it may be proper to remark, that although we understand from the testimony, that the estimated value of the hire of the slaves ($1000,) is exclusive of these three negroes, Jim, Frank and Gustin, yet as there is some ambiguity in the testimony, if the fact be otherwise, and these negroes were included in the general estimate made by the witnesses, the account should be reformed in this particular.

Let the cause be remanded for further proceedings, conformable herewith, and let the costs of this court be equally divided between the complainants and respondents.