## MONTGOMERY vs. GIVHAN ET AL.

1. Where an executor, by an arrangement with the creditors of the estate, obtained indulgence on the debts, which enabled him to purchase some of the property, at a sale under an order of the Chancery Court, which was had by consent, he was held to have purchased for the benefit of the estate, and not for himself individually; there being, also, some evidence of his declarations or admissions, at the time of the sale, that he was purchasing for the estate.

2. Where a bill is filed against an executor to compel a settlement and account of his trust, and to have complainant's portion of the estate (she being a married woman, and her husband insolvent) settled to her separate use, if the bill alleges that certain slaves in the defendant's possession were purchased with the funds of the estate, while the proof shows that they were purchased with his own individual funds, but under such circumstances that a court of equity would consider them assets of the estate, there is no fatal variance between the allegations and proof.

3. When an admission of record is made by counsel in the court below, for the purpose of obviating the necessity of proof, it will be presumed that he had authority to make it, and the admission cannot be withdrawn in the appellate court.

4. Where the executor was also complainant's guardian, he should be allowed a credit, on the settlement of his accounts in equity, for reasonable expenses in boarding, clothing and educating her, although such expenses may exceed the interest or annual profits of her estate in his hands, if they were necessary under the circumstances; and if she, while residing with him, performed valuable services for him, she is entitled to set-off their value against his demand for board, &c.

5. If the ward and her husband continue to board with her guardian, after

Montgomery v. Givhan et al.

their marriage, it will be presumed, in the absence of proof of any contract or agreement between the parties, that it was understood between them that the price of their board should be charged to the wife's property in the hands of her guardian; and the guardian will be allowed a credit for the amount, on the subsequent settlement of his accounts in equity, although the husband is insolvent.

6.  The executor would also, in such case, be entitled to a credit for the value of slaves delivered to complainant and her husband when they commenced house-keeping, when complainant does not offer, in her bill, to return them, and her husband assents to her right to have them settled upon her for her separate support and maintenance.

7.  The wife's right to a settlement of her property to her separate support and maintenance, is unaffected, as between the executor and herself, by any transactions between him and her husband, which had no reference to her estate in the executor's hands, and were not designed to be credited to that fund.

8.  If the wife's property in the executor's hands, in such case, is more than sufficient for the reasonable support and maintenance of herself and children, and her husband is indebted to the executor on the settlement of their accounts, the executor should be allowed to retain the balance due him from the husband after making a reasonable settlement on the wife.

9.  If the executor, in accounting on settlement with one distributee or legatee, has accounted for less than he might have been charged with, this does not give another legatee any right to a greater interest in the residue.

ERROR to the Chancery Court of Lowndes.

Heard before the Hon. ANDERSON CRENSHAW.

THIS bill was filed, in 1843, by Jane Montgomery, suing by her next friend, against her husband, Robert B. Montgomery, and the executor, legatees and distributees of her father, Job P. Givhan; its object was to compel a settlement and account from the executor, a distribution of the estate, and a settlement of complainant's portion upon her for her separate support and maintenance, her husband being insolvent. The record is very voluminous, but it is unnecessary to give a detailed statement of the allegations of the bill and answers, and the substance of the testimony. The principal questions raised by the pleadings were : first, for what portion of the estate was the executor accountable; and, secondly, to what credits was he entitled.

It appears that the testator died in South Carolina, in 1824, possessed of the undivided half of a tract of land in that State, a section of land in Alabama on which the town of Hayneville is situated, and about forty negroes; that he

37

bequeathed and devised all his property, both real and personal, to his widow and eight children, and appointed Richard Appleby and George Givhan his executors; that Appleby first qualified as executor in South Carolina, said George Givhan being then a minor, and Givhan afterwards qualified there, on attaining his majority, and also took out letters testamentary in Lowndes County, Alabama; that the testator, during his life-time, had conveyed said slaves, by voluntary deed, to his wife and children; but after his death this deed was set aside, by the Court of Equity in South Carolina, as fraudulent and void against existing creditors, and the slaves were decreed to be sold to satisfy certain judgments recovered against the executor, in suits which were commenced against the testator while living. The complainant charges, that the executor, George Givhan, purchased eleven of these slaves at the sale, for the use and benefit of the estate; and that with the profits of their labor, and nine other slaves belonging to the estate which he had previously brought to Alabama, he purchased several other slaves, which are now in his possession; that he also purchased the Hayneville tract of land for $5000, for which he has never accounted; and that he has received the rents and profits of the ferry and tract of land in South Carolina; and complainant seeks to make him account for all these items.

The executor admits that he brought nine of the slaves to Alabama, but insists that the profits of their labor were insufficient to support the children of the testator; also admits that he purchased eleven of the slaves at the sale in South Carolina, but insists that the purchase was made for his own, individual benefit, and not on account of the estate; states that the Hayneville tract of land was sold under an order of court, and he became the purchaser at the price of $5000, and bought for himself individually; that the ferry place in South Carolina was sold by the sheriff under execution, and purchased by one Campbell, and that he afterwards purchased it from said Campbell, but for himself individually, and not for the benefit of the estate. He admits his liability to account, on settlement, for the nine slaves brought by him to Alabama, and for the price of the Hayneville tract of land, but for these only; and he insists that he

is entitled to a credit for advances made to complainant and her husband, for the expenses of complainant's board, clothing and education, incurred by him as her guardian, and for the amount of her husband's indebtedness to him, which he insists upon as a set-off; and all these credits being deducted from complainant's portion of the estate, he insists that she has received more than her share.

The Chancellor held, that the purchase of the eleven slaves by the executor in South Carolina was intended by him for his individual benefit, and did not enure to the benefit of the estate ; that the executor was only accountable for the nine negroes brought by him to Alabama, with their increase and the profits of their labor, and the price of the Hayneville tract of land ($5000), with interest thereon ; that he should be allowed a credit for boarding, clothing and educating complainant, and for other incidental expenses incurred by him on her account, unless intended as a gratuity, making a deduction for the value of her services, if they were worth anything to the executor, who was also her guardian ; that he should be allowed, also, a reasonable charge for boarding complainant and her husband after their marriage ; that the negroes which he delivered to complainant and her husband when they commenced house-keeping, and which they received and accepted, must be considered a satisfaction, *pro tanto*, of complainant's distributive share of the estate, according to their value when so received ; that all moneys paid by the executor to R. B. Montgomery, or to other persons for him, or on his account, after his marriage with complainant, and before he became insolvent, and all his indebtedness to the executor which accrued within that period, must be considered as advances made on the faith and credit of complainant's portion of the estate in the hands of the executor. A reference of the matters of account was ordered, on the principles laid down in this decree, if complainant wished to have the account taken ; otherwise, it was ordered that her bill be dismissed at the cost of her next friend. This decree is now assigned for error.

John A. Elmore, for plaintiff in error :

1. The deed mentioned in the pleadings **cannot affect com-**

plainant's rights or remedy. Givhan does not set it up in any form, nor claim anything under it; but he and all the legatees have uniformly, since the decree in South Carolina, treated it as a nullity. Complainant bases her claim on the will, and 'not on the deed, and charges Givhan with liability as executor.—He admits his liability, as executor, for part of the property; and if liable for this in that character, he must be liable throughout as executor. He was executor; he always acted as executor; his acts as executor were acquiesced in; he is bound thereby, and must answer as such.—Van Eppes v. Van Deusen, 4 Paige 64, 71; Brown v. Lynch, 1 ib. 147; White v. Swain, 3 Pick. 365; Andrews & Bro. v. Jones, 10 Ala. 400; Parkist v. Alexander, 1 Johns. Ch. 394; Reed v. Warren, 5 Paige 650; Billington's Appeal, 3 Rawle 48; Brown v. Brown, 1 Strob. Eq. 363.

2. The complainant is entitled to share in all the advantages acquired by the executor's various arrangements with the creditors, his purchases, and his settlements with other legatees.—He is the trustee for the common interest, and all these benefits enure to the common interest.—Jeremy's Eq. pp. 144, 543, 545; 1 Story's Eq. § 465; 2 ib. §§ 1210, 1211; 3 Rawle 48, *supra*; Bush v. Bush, 1 Strob. Eq. 377; and other cases cited above. The principle in Billington's Appeal applies on the converse state of facts.

3. The purchases made in February, 1829, of the eight negroes, and afterwards of seven others, were made on a satisfied decree, to which Givhan was a party, and of which satisfaction there was record evidence except as to $200. These eight negroes were sold separately, as shown by the separate prices in the register's report. The sale of Plenty then satisfied the decree, and the executor is liable for the other seven, as also for Sam and the hire of Bella. But, although Bella was sold last, yet, as all were sold at the same time, and no money was paid by the executor, the law will declare the decree to have been satisfied by the sale of Bella, and the executor will hold the rest as the property of the estate.

4. The sales of the negroes in February, 1829, and of Sam afterwards, were at the instance of the executor; and, though the sales were made by the commissioner, under an order of court, on a valid, unsatisfied decree, the executor cannot hold

them absolutely, but holds them, at the option of the parties interested, for the estate.—*Ex parte* Wiggins, 1 Hill's (S. C.) Ch. R. 353, and cases cited in opinion of Ch. Harper, particularly *Ex parte* James, 8 Vesey 337, where the trustee had made arrangements with the creditors. And although the facts are different, in regard to the three first bought in Charleston, the principles declared in all the above cases apply as to them.

5. If the trustee mingle the funds of the estate with his own, so that they cannot be distinguished, or only with great difficulty ; or "if a new ingredient is formed, not capable of a just appreciation and division, according to the original rights of each, the trustee must lose the whole. This is insisted on as to all the purchases made in Alabama.—Story on Bailments, pp. 29, 31, § 40, and cases in notes ; Story on Agency, § 205, and cases in notes ; 1 Story's Eq. § § 468, 623 ; Hart v. Ten Eyck, 2 Johns. Ch. 62, 108 ; Lupton v. White, 15 Vesey 436, 440 ; Docker v. Somes, 2 Myl. & K. (8 Con. Eng. Ch.) 655 ; Myers v. Myers, 2 McCord's Ch. 214, 265. Nor is this rule too harsh to be here applied. There is nothing to induce a relaxation of the rule in Givhan's favor ; the case is not within the principle of Bethea v. McCall. But, if overruled in this, it is insisted, that the executor shall be required to prove how much of his own money was used by him in these purchases, and whence obtained, and that he shall identify the money used as his own as the same received by him from his individual means ; and that complainant should not be required to prove how much of the trust funds he used ; also, that, if he held funds of the estate at the time of his purchases, he shall be declared to have purchased with these funds, and for the estate, if complainant so elects, unless he identifies as his own the money used.

6. The husband can bind the wife's personalty, only by reduction to possession, actual or constructive. When constructive, it is a question of intention, to be sustained by proof. Certain acts (as release, assignment for valuable consideration, &c.) are declared by law to carry with them conclusive evidence of the intention, and, when coupled with the power to reduce to possession, pass the wife's estate, or bind it, as to the personalty. In all other cases, the intention, situation, and act of the husband, rest in evidence.—Terrell v. Greene, 11 Ala.

207 ; 2 Penn. R. 71; Carleton & Co. v. Banks, 7 Ala. 32 ; Smith v. Scudder, 11 S. & R. 325 ; Lodge v. Hamilton, 2 S. & R. 491 ; Hind's Estate, 5 Wharton 138 ; Lewis v. Lewis, 3 Barn. & Cres. 291 ; Bates v. Dandy, 2 Atk. 207 ; Wildman v. Wildman, 9 Vesey 174; Earl Salisbury v. Newton, 1 Eden's Ch. R. 570.

7. And this, to defeat the wife's equities, must be done by an executed, not an executory contract.—Gillett v. Powell, 1 Speer's Eq. 142, 149 ; Hill v. Hill, 1 Strob. Eq. 25.

8. The dealings must be with the husband as such ; there must be an exercise by him of his marital rights, with the view to bind the wife's estate. Any other dealing is on the husband's general credit ; and, like other creditors, the executor can only claim a set-off, or reduction, subject to the wife's equities.— Lodge v. Hamilton, 2 S. & R. 491 ; Terrell v. Greene, 11 Ala. 207 ; Van Eppes v. Van Densen, 4 Paige 64; Lady Elibank v. Montolieu, 5 Vesey 737 ; Carr v. Taylor, 10 Vesey 575; Frankenfeldt's Appeal, 3 Wharton 415. Givhan does not allege, in his answer, any fact to charge the wife's estate with her husband's debts ; and it is proved that the husband, up to his last transaction with Givhan, was in good credit, and of ample means.

9. The same principle prevails, as to the property passing from Givhan's possession to Montgomery's ; whether purchases, or payments *pro tanto*, depends on the circumstances. There is no allegation in the answer that they were received from the executor as payments, or *quasi* advancements ; his failure to allege it is conclusive that they were not so received. If the answer of Montgomery is excluded, no part of the evidence explains the transaction as to these negroes ; but if his answer is looked to, the explanation is consistent with Givhan's answer, and all the circumstances of the case, that Hagar and child and the lot were a purchase, and that Jim was loaned as a nurse.

10. As to the Bank debt paid by Givhan : He was not a privy to the debt, nor bound by it ; and he could not, without Montgomery's consent, pay that debt, and thus make himself a creditor of Montgomery, at least so as to charge the wife's estate. He does not say, in his answer, that he paid this debt with Montgomery's knowledge even.—Frankenfeldt's Appeal, 3 Wharton 415; Weakley v. Braham, 2 Stewart 500 ; Mayor

v. Hughes, 1 Gill & John. 433; Richardson v. McNairy, 1 Con. (S. C.) R. 472 ; 5 Cowen 603 ; 4 N. H. 138 ; 1 South. 213 ; Jones v. Wilson, 3 Johns. 434 ; Beach v. Vandenburgh, 10 *ib.* 361.

11. The defendants did not object, in their answers, or on the hearing, to the want of parties, or the lapse of time; and they will not be allowed to raise the objections now.

J. M. Boling and R. Saffold, *contra :*

1. The answers are responsive to the bill, and deny every material allegation, both general and special. The answers are evidence, not only so far as they deny the matters affirmatively alleged, but even where they affirm and avoid. Taking the case as presented by the record, the conclusion is perfectly just, that George Givhan had no agency in bringing on the sale of the negroes in South Carolina, and that he paid for them, after 1837, with his own means, mainly with money arising from the sale of the Hayneville lots. There is nothing in the record to impugn this sale. It is evident that he never made any valid promise to divide them among all the heirs. The farthest the testimony shows he went, was that he intended—nothing said that was consummated or binding. The record fully sustains this purchase, and that of the Hayneville tract of land, independent of the admissions.—Andrews & Bro. v. Jones, 10 Ala. 400.

2. The advances by Givhan for Montgomery, or Montgomery and wife, and the assumptions by him of the debts of Montgomery, and payments for him whilst he was solvent, were properly considered by the court below as advances on the faith and credit of Mrs. Montgomery's portion, and the executor was properly allowed to make the deduction from her portion.— Whether considered as advances on the faith of the legacy or not, they were debts which the executor would be allowed to retain on settlement; he not being in a situation to sue himself. —1 Dess. 247 ; Purdom v. Tipton, 9 Ala. 914 ; Fonblanque's Eq., Book 4, ch. 2, § 4, and note ; Levessey v. Levessey, 3 Russ. 287, 542 ; 1 Eq. Dig. 498, 813 ; 10 Peters 532 ; 2 Peters' Dig. 277 ; Toller on Executors, pp. 295 to 298 : 1 Lomax on Ex., pp. 412 to 418 ; 7 Dana 457 ; 12 Pick. 173 ; 6 Mon. 257 ; 7 *ib.* 247 ; 1 Wash. 30 ; Pitts v. Curtis, 4 Ala.

Montgomery v. Givhan et al.

350 ; 7 *ib.* 32, 589 ; 2 Gill & Johns. 81 ; 5 Johns. Ch. 196 ;
8 Porter 36 ; 1 McCord's Ch. 191 ; 2 Nott & McCord 151 ;
2 Murph. 151 ; 1 Hill's (S. C.) R. 191.

3. The proof must correspond with the allegations of the
bill, to entitle the complainant to relief. The proof in this case
does not sustain the allegations of the bill, particularly as to
the sale of the slaves in South Carolina, which were bought by
Givhan. The proof is totally different from the allegations as
to this sale, and the complainant is not entitled to relief as to
them ; nor would she be entitled to relief, as to these slaves, if
her bill were so amended that the allegations and proof would
agree.—Clements v. Kellogg, 1 Ala. 330 ; Julian and Wife v.
Reynolds, 11 Ala. 960.

4. The declarations of Givhan, that he intended the property
for the estate, if such were made, were upon no consideration,
and do not bind him. The most reasonable inference to be
drawn from such declarations, is, that he intended the property
for himself and brothers.—Doe *ex dem.* Davis v. McKinney, 5
Ala. 726 ; Lyles v. Sims, Harper's R. 42 ; 2 U. S. Digest,
p. 365, § 108. Of the same character are the declarations of
George Givhan and brothers, in the mortgage to the Bank,
calling the property the slaves of the estate ; and this mortgage
was made, too, as the only terms on which the cashier of the
Bank would grant the parties an extension of time on their
indebtedness to the Bank. The admissions in the mortgage
are only *prima facie* evidence, and may be rebutted by other
evidence ; no one being injured thereby, and they being
made out of court, and not in a suit.—Gresley's Eq. Ev. 323,
355. Mrs. Montgomery and her husband received no injury
from the description of the slaves in the mortgage as the pro-
perty of the estate of Job P. Givhan.—2 Johns. Ch. 209, 222 ;
Venable v. Thompson, 11 Ala. 147 ; Hunley v. Hunley, 15
Ala. 105.

5. The bankrupt act of 1841 operates on the estate of the
person applying for its benefit, so as to transfer to the assignee
not only property in possession, but actions pending, and
mere rights of action ; consequently, all the interest which the
husband had, *jure mariti,* in the choses in action of his wife,
passed to the assignee upon the filing of the husband's petition
in bankruptcy. The bill should have been dismissed, if for no

other reason, because the assignee was not made a party.—Butler and Wife v. Merchants' Ins. Co., 8 Ala. 375; Hunley v. Hunley, 15 Ala. 105.

6. The answers of Montgomery and Mrs. Appleby are not evidence against Givhan.—Gresley's Eq. Ev. 24; Julian v. Reynolds, 8 Ala. 680.

7. An admission, made by counsel of record in a case, is conclusive, and cannot be retracted.—Gresley's Equity Ev. 350, 351.

CHILTON, J.—We have given to the record in this case a laborious examination, and proceed to state, as briefly as we can, the conclusions we have attained.

1. It is very clear, that the voluntary deed executed by the testator, and which, since his death, has been set aside by the Court of Chancery in South Carolina, can have no legitimate influence upon the decision of this cause; first, for the reason, that both the executor and the legatees under the will seem uniformly to have regarded it as inoperative; and, secondly, the bill proceeds under the will for distribution, and not under the deed, and the executor admits the receipt of certain property belonging to the estate, and which is embraced in the deed, in his capacity as executor, and his liability to account as such, but insists that the complainant has received her full share. As neither party insists upon the deed, we will lay that out of view, and proceed to ascertain the rights of the parties irrespective of it.

2. It is conceded, that the testator, Job P. Givhan,, made his will, by which, after making certain dispositions of portions of his property, he directed that the balance of his estate, both real and personal, should be " divided, in equal parts, among his eight children." The complainant is one of his children, and entitled to share an interest of one-eighth in the estate. It appears, that Richard Appleby first qualified as executor of the will, the said George Givhan being then under age; that several judgments were rendered against him as executor, and that Appleby treated the deed, which disposed of the testator's slaves, and which was executed prior to the will, as passing the property. One of the creditors thereupon filed a bill in equity, and the deed was declared fraudulent and void as to pre-existing

debts; and the commissioner was ordered to take an account of the debts due from the estate, and to seize upon sufficient of the assets embraced in the deed for their satisfaction. The cause having been removed from the Charleston to the Colleton District, the commissioner of the Colleton District proceeded to state the account, ascertaining the sums due to the creditors, and to seize upon and sell divers slaves belonging to said estate.

At said sale, the defendant, Givhan, who was then one of the executors, purchased divers of the slaves; and the first question we propose to notice, is, whether this purchase is to enure to his individual benefit, or is to be considered a purchase for the benefit of the estate. The bill charges him with having procured the sale, and with having purchased with the means, and for the benefit, of the estate. In response to such allega· tions, the defendant states, that by the decree of the Chancery Court, setting aside the deed, it was decreed that the assets of the estate should be placed in the hands of the commissioner of said court, and that the commissioner should proceed to sell so much thereof as should be necessary to pay and satisfy the debts of the estate; that in pursuance of said order, the commissioner proceeded to sell thirty-seven of the slaves; that he does not recollect the amount of the debts, but avers that no money was left after paying the demands against the estate; that these thirty-seven slaves were all that belonged to the estate, except nine which the respondent had before that time brought to the State of Alabama. He denies that he received any portion of the proceeds of the sale, and says that he had nothing to do with the sales, or settlements. He admits that he purchased the following slaves, at the sales made by the commissioner, viz., Morris, Venus, Frank, Plenty, Scipio, Ellick, Sarah, and her two children George and Phibby; also Peggy, Linda, and Sam; that he paid cash for Sam, and may have raised the money which purchased him from a sale of the cotton made in Alabama with the negroes brought to this State; but in making this arrangement, he left debts due from the estate unpaid, which required him to pay out his individual funds in their extinguishment, to an amount greater than that used by him from the proceeds of the crop; that Sam died in less than a year after his purchase; that Peggy died in about three years after her purchase, and Scipio in about four years

thereafter; that as to the other slaves purchased by him, he paid for them out of the proceeds derived from the sale of town lots in Hayneville, two or three hundred dollars in the sale of horses and other individual property, besides some means which he borrowed, and the proceeds of cotton crops raised by nine hands, which he and his two brothers had, and of nineteen working hands, which he had in his possession during the years 1836 and 1837, of the estate of one Drury Fort, of which estate he was administrator. He denies that one dollar of money belonging to the estate, or arising from crops made by hands belonging to the estate of J. P. Givhan, was paid; but on the contrary, insists, that there were but five of said nine slaves capable of working, and that the proceeds of their labor did not support the children of the said Job.

The defendant also avers in his answer, that, upon his purchase at the commissioner's sale, which was made at Charleston, the Hamiltons agreed to extend the time of payment, and to give him a receipt for the amount of his bid against so much of their claim. The amount thus receipted was $1500, for which he gave his note to the said Hamiltons. The other portion of the slaves were purchased at Waterborough; and for the amount bid by him, it was agreed that the Hamiltons should indulge him, upon his executing a mortgage upon the slaves, and giving his bond for the amount, being about $1400; which mortgage and bond, it seems, were afterwards assigned to the Hamiltons, by the commissioner, in payment of their debt against the estate. These papers, together with a transcript of the proceedings in equity in South Carolina, appear in the record before us.

From the report of the master it appears, that the total amount of debts proved before him, embracing the demand due the Hamiltons, was $7565 45. The amount of the proceeds of the sales appears by the record to be $8012 50; thus leaving a balance of $447 05 as overplus, after paying the debts. To this sum should be added the price at which the slave Sam was afterwards sold, being $300, which makes the overplus, after paying the amount of the indebtedness of the estate as disclosed by the record, the sum of $747 05. What disposition, if any, was made of this sum, the record does not inform us.

Conceding that an administrator, or an executor, with an

interest, may purchase at a sale made of the goods of the estate which he represents, if the sale is conducted fairly and openly, as has been several times decided by this court; still, we think, there are circumstances connected with the sale and purchase of these eleven slaves by George Givhan, which show, beyond a reasonable doubt, that he concluded the purchase for the benefit of the estate, and not on his individual account. We do not propose to comment upon tne voluminous testimony of the numerous witnesses who have been examined, and which with much care we have sifted, but merely upon the leading facts in the cause which have led us to this conclusion.

In the first place, the record of the chancery proceedings in the State of South Carolina, presents the claim of the defendant in no very favorable light. It seems, by the proceedings had in that State, that, although the assets of the estate of Job P. Givhan were more than sufficient to pay all the debts due from it, still, expensive measures were resorted to unnecessarily to affect their adjustment. Instead of the executor's selling sufficient of the property to pay the debts, and distributing the residue as required by the will, the debts remain unpaid, and the creditors are driven to their bill, and the estate put to all the expense consequent upon a protracted suit in equity. It may be replied, that the mismanagement of Appleby, and not of Givhan, caused this litigation. There is no doubt, that the misconduct of the former originated it; but it is equally clear, that the defendant, Givhan, contributed to its continuance, at least in respect of the property which he purchased. He was qualified as executor in November, 1827, and in the same year was made a party to the bill, before the cause was transferred from the Charleston to the Colleton District, at which time only seven of the slaves had been sold, which brought $1115. He had, previous to that time, and before the commencement of the chancery suit, removed a portion of the slaves to this State; which circumstance the chancellor in South Carolina (Dessaussure) regarded as creating just suspicion against the parties, and which, no doubt, had its influence in the question of costs which were taxed against the estate, as well as in originating the proceedings. On the 14th May, 1828, the decree was rendered in the case of Hester A. Forde, subjecting the property embraced in the voluntary deed to the payment of her demand.

It will be observed, that hers was not a creditor's bill; she only prayed relief for an amount which, she alleged, was due her from the testator, and for which the bill sought an account. Three days after the decree in her favor, a decree was rendered, by the consent of the parties, that the commissioner in equity for Colleton District should "immediately proceed to seize as many of the negroes included in the voluntary deed, as may be sufficient to satisfy the demands of the creditors entitled to payment," &c. ; and he was further ordered to sell the same and retain the proceeds in his hands, until he could advertise for the creditors of the estate to come in and prove their demands before him ; after which he was ordered to marshal the assets, and to pay over the funds in his hands to such of the creditors as should prove their demands, according to their legal priorities.

In obedience to this last decree, the commissioner of Colleton seized seventeen slaves, and sold them for $4,830, from which he deducted expenses (say $135 86). This, added to the net proceeds of the sale of the seven slaves ($1,108 36), makes $5,802 50. Now, the amount of debts, exclusive of the demand of F. & M. Hamilton, embracing cost and interest, with the commissioner's fee for disbursements, was $4,576 35 ; leaving a balance of $1,226 25 in the hands of the register. It does not appear when the sale of these seventeen slaves was made ; but it must have taken place between the time when the decree which authorized it was rendered, and the confirmation of the master's report, which was the 22d day of January, 1829. At this sale, George Givhan became the purchaser of only three of the slaves, viz., Frank, Morris, and Venus, which he bid off at $1,230. The master, in the report which gives an account of the sales, states, " that upon investigating the account of George Givhan, as one of the executors of Job P. Givhan, it appears that he has paid, on account of the estate, part of the demand

| | | |
|---|---|---|
| of F. & M. Hamilton, | $1,500 | 00 |
| Other small charges, | 25 | 00 |
| Commissions at 2½ pr. cent., | 38 | 12 |

| | | |
|---|---|---|
| Making in the aggregate, | $1,563 | 12; |

and has received nothing ; whereby the estate is indebted to him in this amount. But as a claim by him to be paid out of

the assets of the estate in hand, to the exclusion of any other creditors, would lead to many intricate investigations; and as there are assets of this estate which will probably be recovered, the said George is willing to seek payment from them, leaving the funds in hand to the creditors here. It is therefore recommended, that the amount of $1,563 12 be decreed to be paid him by the estate of his said testator."

If this report correctly sets forth the facts of the case as they there existed, the conclusion irresistibly follows, that the $1500 receipt taken by George Givhan from the Hamiltons, in part for their debt against the estate of Job P. Givhan, was not received by the commissioner in equity in payment of the three slaves above named, as sold by him to said George; and further, that the arrangement made with the Hamiltons, at least so far as regarded the $1500 receipt, was for the benefit of the estate, which thereby became debtor to the said George, for the sum thus paid, or agreed to be paid, and for which he was then, as the record recites, willing to seek payment from the other assets of the estate. If we exclude from the debts to be paid out of the proceeds of the seventeen slaves this $1500, and allow the remainder of the claim of Hamilton with the costs, which amounted to $1,525 58, the amount of said sale only fell short of paying the entire indebtedness of the estate proved before the commissioner, by the sum of $194 83. It appears, however, by another report, that the commissioner proceeded on the 2d day of February, 1829, to sell nine other slaves, eight of which were purchased by said George Givhan for $1,910, and one by a stranger at the price of $300; and here the record closes, without giving us any further information as to what disposition was made of the proceeds.

The sale to the stranger for $300, was sufficient to have paid the remainder of the debt, and have left say $100 to meet the costs of the suit. It is manifest, then, that the eight slaves were sold for the benefit of George Givhan, to pay him the sum upon which he had procured indulgence from the Hamiltons; for, as to the demand insisted upon by H. T. Crumpton, that was rejected by the commissioner, as constituting no charge against the estate; the note upon which the judgment was rendered, having been executed by Applebly, and there being no proof that the estate was in any way bound for its payment.

The question then comes up, was it competent for George Givhan to avail himself of this demand, which he assumed to pay to the Hamiltons, to sell the assets of the estate under this general order of the Court of Chancery, which was made by consent, and to acquire a good title to the property in opposition to the estate? It will be remembered, that he paid no money upon the purchase of these eleven slaves; and the Hamiltons, of whom he obtained an extension of the time of payment, expressly state that the indulgence was granted for the benefit of the estate. Moses Hamilton swears, that the defendant, George Givhan, told him, at the time the indulgence was granted, "that his motive was to get time, in order to work the property to the best advantage to pay the debt, *so as to enable him to save the property for the benefit of the estate.*" Frederick Hamilton, who then resided in this State, deposes, that said George wrote to him, and stated, that if he would consent to the indulgence, and permit him to bring the slaves into this State, where he could have fresh and rich land to cultivate, it would enable him to work the slaves and pay this debt, without the property being sacrificed; and that the arrangement was made wholly for the benefit of the estate. Under these circumstances, we feel constrained to pronounce that the purchase at the commissioner's sale, did not vest in the said executor a title which he can successfully urge in opposition to the estate.

The general rule, applicable to all such cases, is, that a trustee is never permitted to make any profit to himself in any of the concerns of his tsust.—Docker v. Somes, 2 Myl. & Keene 664; 1 Story's Eq. § 465. "A trustee," says Judge Story, "is bound not to do anything which can place him in a condition inconsistent with the interest of the trust, or which has a tendency to interfere with his duty in discharging it; and this doctrine applies, not only to trustees strictly so called, but to other persons standing in like situation," &c. He also adds, that executors or administrators will not be permitted, under any circumstances, to derive a personal benefit from the manner in which they transact the business, or manage the assets of the estate.—*Ib.* § 322. The rule is well settled, that an administrator, or an executor, is not permitted to purchase up the debts of the deceased on his own account; but whatever of advantage is thus derived by him, by purchases at an under

value, is for the common benefit of the estate.—*Ib.* This rule is not founded upon the supposition, that there is always, in such cases, something morally wrong, but upon the policy of the law, withholding inducements to peculation and fraud—thus shielding the party from temptation.

In *Ex parte* Lacey, 6 Ves. 426, Lord Eldon, speaking of the purchase by an assignee, of the debts of a bankrupt, and of his estate, says. "In that respect, there is no difference between assignees and executors, who cannot, for their own benefit, buy the debts of the creditors. I do not say there may not be cases of that kind, in which, in a moral view, the transaction between the executor and the creditor may not be blameable; but the court must act upon general principles.—Unless the policy of the law makes it impossible for them to do anything for their own benefit, it is impossible to see in what cases the transaction is morally right." In *Ex parte* James, 8 Ves. 337, the same learned Chancellor said, "An executor cannot buy for his own benefit debts due from the testator's estate. Any stranger may; but the executor is bound to do his best for the estate." In Van Horne v. Fonda, 5 Johns. Ch. R. 388 (408), it was held, that an executor had no right or power to extinguish a mortgage or other debts for his own benefit, or to traffic with the estate for his own emolument: that he cannot be permitted to raise in himself an interest opposite to that of the party for whom he acts.—See, also, Tebbs v. Carpenter, 1 Madd. Rep. 300; Forbes v. Ross, 2 Bro. Ch. R. 403.

So in purchases by a trustee, other than executors or administrators with an interest, of the trust effects, it has been several times held by this court, that the *cestui que trust* can have the sale set aside by timely application to a court of equity.—Saltmarsh v. Beene, 4 Port. 283–293; McKinley v. Irvine, 13 Ala. 681; Cunningham v. Rodgers, 14 *ib.* 147; Harrison, adm'r, v. Mock *et al.*, 16 *ib.* 616. In Harrison and Gardner, adm'rs, v. Mock, 10 Ala. 185, it was held, that where a trustee, after the acceptance of the trust, caused a sale of part of the trust property to be made under execution for his own benefit, and became himself the purchaser, he would be considered as having purchased in his character of trustee, for the benefit of those concerned in the trust.

On the other hand, as respects executors and administrators,

as we before said, the doctrine of this court as first settled in Brannan v. Oliver, 2 Stew. R. 47, and explained in Saltmarsh v. Beene, 4 Porter 283, and affirmed in McLane v. Spence, 6 Ala. 894, is, that where they have an interest in the property purchased, they may conclude the purchase for their own benefit; provided there is no unfairness, and the property is exposed to sale in the usual and ordinary mode, and under such circumstances as will command the best price. The case before us does not come within these decisions of our court. Here the property was not sold in the ordinary mode: a bill is filed for the ascertainment and payment of one debt, which, *by consent*, is invested with the properties of a creditor's bill ; and the assets, instead of being duly administered upon and sold in the ordinary mode for the satisfaction of the debts, are turned over to the commissioner in equity, who makes a forced sale. The executor avails himself of an indulgence or credit given to the estate, to become the purchaser of the property. Upon $1500 of that sum he is allowed two and a half per cent. as executor for making the payment for the estate, and then avails himself of the debt, as though no indulgence had been given or payment made, to purchase in the property, as upon a cash sale. To hold that such purchase would vest in him a title to these slaves, in opposition to the estate, would be to extend the doctrine asserted in Brannan v. Oliver, and to fritter away a most salutary rule, conceived in the profoundest wisdom; which is, that the beneficial arrangements made by an executor of an estate, with the creditors thereof, shall enure not to him individually, but to the common benefit of the estate.—1 Story's Eq. (4 ed.) § 322, p. 348, and the authorities cited in note 4 ; 2 Hen. & Munf. 245 ; 1 Dess. 150.

If, however, we were mistaken in the application of this rule of equity to this case, we are, in the second place, very clearly of opinion, that there is a strong preponderance of the proof in favor of the proposition that these eleven slaves were purchased by George Givhan for the benefit of the estate. The two notes given by George Givhan to the Hamiltons, for the $1500, were executed by him as executor of his father's estate. He was allowed commissions of two and a half per cent. upon the same, as so much paid by him for the estate. In addition to his repeated declarations, at various times, that he had bid

in the property for the estate, and his recital of the fact in the mortgage given to the Bank, he told P. R. Appleby, at the time of the sale, " that he was bidding in said slaves for the benefit of the estate, and that he was to work the property to the best advantage, to pay the debts and save the property for the estate." This testimony, connected with the evidence of the Hamiltons, above alluded to, and the proof of Geo. Givhan's admissions, made by the witnesses W. Givhan, Wm. Crenshaw, H. M. Phillips, E. Marven and others ; as also with the fact, that at the time of the purchase, and for several years thereafter, said George had no property of his own ; and with the further fact, that the bills of sale for the slaves, and the mortgage given by him to the commissioner, were not executed until more than a year after the purchase : all these considerations impel us to conclude, that, whatever may have been his intention after he had bid off the eleven slaves, at the time of the purchase he designed them, and bid them off, for the benefit of the estate of which he was the executor; and he must be regarded as holding them in that capacity, and liable to account for them as assets of said estate.

In respect to the payment for these slaves, we think the allegations of the bill are unsustained by evidence. The proof on this point is wholly insufficient to overcome the positive averment in the defendant's answer, in response to the bill, that not one dollar belonging to the estate was used in making the payment ; and while the defendant must be held to account for the slaves, and their reasonable hire, or the profits of their labor, if such can be ascertained, he is entitled to have an account of the money he paid out for the estate, which will be allowed him with interest from the payment thereof.

But it is insisted, that this shows a variance between the proof and allegations of the bill, and that upon this ground the relief should be denied. We do not think the objection can be sustained. The *gravamen* of the bill is for an account against the executor, who is charged to have in his possession, and to be liable for, certain assets belonging to the estate ; and these eleven slaves are charged to constitute a portion of those assets. The bill charges that they were purchased with the funds of the estate. This, we find, is not proved ; still, they are assets, and the plaintiff's right to have the executor account for them is

sufficiently made out; and this is substantially the right claimed by the bill. That the defendant, instead of the estate, paid the demands under which, it is alleged, they were sold, does not show a title to relief variant from that set up, but is important only upon the accounting, as affecting the amount to be recovered. That the executor paid for the slaves with the funds of the estate, is only one of several reasons assigned by the bill why they should be regarded as assets. The allegation may, therefore, well be rejected, and the plaintiff's title remain the same.—See Gresley's Eq. Ev. 170, *et seq.*; 2 Dan. Ch. Pr. 1000-1-2.

In respect of the profits arising upon a sale of the Hayneville lots, and the proceeds or profits of the land in South Carolina, on which was located the ferry, as also the ten slaves purchased of Scott, we are distinctly informed by the record, that at the hearing of the cause in the court below, the solicitor for the complainant abandoned all claim for them. When an admission is thus made, which obviates the necessity of introducing proof in the court below, to rebut the plaintiff's claim, it cannot be withdrawn in this court, so as to render a decree irregular, made in conformity with such admission. Further, " if the fact is admitted by the attorney, on the record, with the intent to obviate the necessity of proving it, he must be supposed to have authority for this purpose, and his client will be bound by the admission."—Gres. Eq. Ev. 39. But, laying the admission of the solicitor out of view, we agree with the Chancellor, in the opinion that the complainant is not shown by the proof to be entitled to a decree on account of these items. It is true, that some declarations of the defendant are proved, which tend to establish the contrary; but they are not sufficient to overcome the positive denials of the answer, which, in respect to two of the items, is very fully sustained by the proof. Neither is it satisfactorily shown that the executor has used the funds of the estate in the purchase of other property. On the contrary, it pretty satisfactorily appears, that the purchases were made with the means and moneys of the defendant, arising from the sale of his Hayneville town lots, and other accruing sources of income, which are set forth in the answer.

The conclusion which results from these inquiries, is, that the defendant, George Givhan, should be chargeable with, and

should account for, not only the nine slaves which he brought from the State of South Carolina, and their increase, together with the annual profits arising from their labor, as also for the five thousand dollars for which the lands belonging to the estate situate in Lowndes County were sold, and the interest on the same (which is the decree rendered by the Chancellor); but he should also be decreed to account, as executor, for the twelve slaves purchased by him in South Carolina, together with their increase and the annual profits of their labor. These items must be regarded as composing the estate of Job P. Givhan, for which the defendant as executor should be held responsible, deducting the expenses of such as could render no service, and crediting him for such of them as have died.

It remains to consider, what portion of the complainant's share of the estate she has received, and what credits should be allowed the executor upon the accounting. And, first, we are clearly of opinion, that he ought to be allowed all reasonable charges for boarding, clothing, and expenses incurred in edu· cating the complainant; and although such expenses should exceed the interest or annual profits arising upon the complain- ant's share, still, if they were under the circumstances neces· sary, and such as a Court of Chancery would have decreed, they should be allowed.—Clay's Dig. 268; Stewart, guardian, v. Lewis, 16 Ala. 734. On the other hand, if the complainant, while residing with the said executor, who was also her guar- dian, performed services for him, she is entitled to set-off the value of these services against this demand for board, &c., as far as it may go.

In the next place, we think the executor should be allowed for the board of the said complainant and her husband, and for the keep of their horses, so far as these items are shown to exist by the proof and were not intended as gratuitous. We think it but a reasonable inference from their continuing to board with the defendant after the marriage, as the complainant had done before (the defendant having in his hands the share of the estate to which they were entitled), that it was understood between the parties the price of the board should be charged to the effects in the hands of the executor, in the absence of any agreement that the same should be otherwise settled; and that the disallow- ance of such item, now that the husband is insolvent, would be

inequitable and unjust. If, however, the husband of the complainant contributed provisions and the like, which were consumed by the family, or the wife rendered services, these should be allowed.

In the third place, we think the three negro slaves which were turned over by the executor to the complainant and her husband, should be considered a payment to the extent of their value at the time of the delivery, and allowed the executor upon accounting. It is shown that they have continued in possession of complainant and her husband, down to the time of the exhibition of her bill. In the mean time, the husband has become insolvent, and has availed himself of the benefit of the bankrupt law. It is not shown that he now asserts any claim to these three slaves, or that his marital rights have attached to them. They may, then, be considered as subject to the wife's equity, as property belonging to the estate, since they are in possession of herself and husband, and the latter assents by his answer to the claim of complainant to have her share of the estate settled upon her, and no proposal is made by either of them to return the slaves to the estate, or to account for their hire. While she shall receive, she must do equity, and the slaves being retained by her, she should be charged with them.

With respect to the indebtedness of R. B. Montgomery to the executor, both for the town lot sold, and moneys loaned or paid out for him, which dealings had no reference to the estate of the wife in the hands of the executor, and were not designed to be credited to that fund, we think it very clear from the authorities, that the complainant's right to a settlement remains unaffected by it. We had occasion to examine this question in the case of Savage, adm'r, v. Benham, at the present term ; and we there held, that where the husband of a legatee receives money from the executor, not *as husband* in payment of the legacy, but under a contract to refund the same, the wife's equity remained unimpaired. With this decision we are satisfied ; and as it is decisive of this point, it is needless to add more upon it. If, upon the accounting, it should turn out that the portion of the estate which belongs to the wife, to-wit: one eighth, should be more than adequate to the decent support of her-

self and children, and Robert B. Montgomery should be indebted to the executor after balancing the accounts between them, the executor should be allowed to retain the balance due him, after making a suitable settlement upon the wife.

That the executor has made a settlement with another of the legatees, by which the latter may have recovered and received less than was actually due, does not entitle the complainant to receive more than her appropriate share.— She is entitled to her share as though no settlement had been made with any of the others. If too little has been paid, it is the moral duty of the executor to pay the remainder, if it cannot be enforced by judicial interposition; and for aught that this court can know, the proceedings determining the amount of the executor's liability may yet be opened, and the proper amount decreed. Be this as it may, we do not feel justified in taking the share properly belonging to one distributee and conferring it upon another.

It results from the views which we have taken, that the Chancellor both mistook the facts and misconceived the law in his decree. It must consequently be reversed, and the cause must be remanded, that the matters of account, &c., may be referred, and a final decree rendered in conformity with the priciples above laid down.

NOTE BY THE REPORTER.—This opinion was pronounced at the November term, 1849, but has never been reported.