## LANG, ET AL. v. PETTUS.

1. Where slaves are left by will to minor children, the executor is not discharged by delivering them to the children's father, but is accountable on their attaining majority, if the slaves are removed from the State and converted.

2. The court of chancery has power to appoint the father guardian of his child's estate, and after giving the requisite security, he may receive a personal legacy coming to his infant child.

Writ of Error to the Orphans' Court of Madison.

THE case made by the record is this: Some time in the year 1827, Nancy Graves died in Madison county, having made a will, which was there afterwards admitted to probate, and the defendant, Pettus, named and qualified as executor. By this will, the testatrix gave to the petitioners, by the name of the children and heirs of Susan Lang, certain slaves, which came to the possession of the defendant as executor. The object of the petition is to compel the executor to deliver the slaves to the petitioners. The defendant, in answer to the petitioner's claim, set up that he delivered the slaves coming to them under the will of the testatrix, to their father, in the year 1330, the petitioners then being minors.

The proof at the hearing of the petition, showed that certain slaves were given by the will of Nancy Graves, to the petitioners, by the description of the heirs of Susannah Lang, deceased, came to the defendant's possession, as executor, and that he delivered them over to John Lang, sometime in the year 1830, by whom the slaves were carried without the State, and afterwards disposed of. John Lang was the father of the petitioners, who then were minors.

Under this state of proof, the orphans' court considered the delivery of the slaves by the executor, as a discharge of his duty, and dismissed the petition.

This is now assigned as error.

ROBINSON, for the plaintiff in error, argued, that the father, as natural guardian of his children, had no authority to receive the legacy of his infant children, and consequently, a delivery to him was no discharge for the executor. [Isaacs v. Boyd, 5 Porter, 388; Chappel v. McMullen, 8 ib. 198; Garrett v. Talmadge, 1 John. Ch. 3; Merrill v. Dickey, ib. 153; Williams v. Storrs, 6 ib. 353; Miles v. Bayden, 3 Pick. 213; Hyde v. Stone, 7 Wend. 354; Kline v. Beebee, 6 Con. 494; Fonda v. Van Horne, 15 Wend. 631; Dailey v. Tolferry, 1 P. Wms. 285; Rotherham v. Fanshawe, 3 Atk. 629; Cooper v. Thornton, 3 Bro. Ch. 96.

The father's claim to guardianship may be even set aside by the orphans' court, which is invested with the general authority to appoint guardians for all minors. [Huie v. Nixon, 6 Porter, 77.] If the subsequent decision in Hall v. Lay, 2 Ala. Rep. 529, which holds that no guardian can be appointed by the orphans' court, when the father is living, can be sustained, it is not an authority to warrant the delivery by a trustee, of the minor's personal legacy to the father. What is said there on this point is a *dictum*; nor did the question arise in Wood v. Wood, 3 Ala. Rep. 756, where the previous case is referred to as settling the point.

No counsel appeared for the executor.

GOLDTHWAITE, J.—1. The precise question in this cause is, whether, when a bequest of slaves is made to a mi-

nor, the executor will be discharged by a delivery of them to the father of the minor. We think it a mistake to suppose this point has been decided affirmatively by this court, though there certainly are *dicta*, which, without explanation, may have the effect to mislead the profession, as they doubtless did the orphans' court in this instance.

The point of decision in Hall v. Lay, 2 Ala. Rep. 529, was the validity of an appointment *by the orphans' court* of a guardian to a minor whose *father was living*. We held the appointment invalid, on the ground that the father was guardian by nature of his child, and because *that court*, neither by the common or statute law, was invested with power to appoint guardians for minors so conditioned. In illustrating the position then assumed, we said, " we cannot doubt there was a period once known to the common law, when the father had the right to the custody and control of his child's estate, in the same manner as he now has of his person." After citing some authorities to sustain this assertion, as well as others which seem to maintain an opposite doctrine, we advert to recent decisions of the English courts of law, which recognize the authority of the parent, as guardian, to control the real estate of the child, by either leasing it or occupying it, at pleasure. None of these matters were then however determined, and we expressly state it to be our intention not then to examine how far the doctrine, that the father has no control over his child's estate, is correct— or when it arose and was engrafted on our law, if indeed it was so. We also added, " it will probably be found to be sustained mainly on the fact, that a court of equity will sometimes interpose its aid to prevent the personal estate of the infant from being squandered, and require the father to give security to have it forthcoming when the child becomes of age, but that even in such cases, he is never deprived of the custody of the estate, if willing to give the requisite security."

In the subsequent case of Wood v. Wood, 3 Ala. Rep. 756, we fell into the mistake of stating the previous decision as settling the right of the father to the control and possession of his child's personal estate during minority, and warranting the delivery by an executor, of a personal legacy be-

queathed to an infant. The mistake, at the time, was un-important to the conclusion arrived at in that particular case, and is only necessary now to be adverted to for the purpose of reconciling the conflict, which, without this explanation, would seem to arise between that decision and Boyd v. Isaacs, 5 Porter, 388, where it is decided, that a father, although the *prochein amy* to a suit for his child, could not, either in that quality or as his natural guardian, release or compromise the suit. Having thus disposed of the supposition, that the question is concluded adversely to the claim of the petition-ers, we shall proceed to discuss it.

It is not the least curious matter connected with legal sci-ence, that the most eminent judges and lawyers of England should have found the relations of parent and child involved in such obscurity that it was a matter of profound difficulty as late as the close of the last century, to ascertain the foun-dation of chancery jurisdiction over the persons and estates of minors, where fathers were living. It was then, however, firmly established, though even there is exercised only in pe-culiar cases. [Butler v. Freeman, Amb. 301; Cruize v. Hun-ter, 2 Cox, 242; Ex parte Warren, 4 Bro. Ch. 101; DeMan-neville v. DeManneville, 10 Vesey, 52; Hargrove's note 70 on Coke Litt. 89, a; 2 Fonb. 224.] With the exercise of this jurisdiction we have no concern at present, beyond the precise question before us.

We endeavored, in Hall v. Lay, 2 Ala. Rep. 529, to show there was once a period of the common law when the father was invested with the control of the entire estate of his child during minority, whether that estate was real or personal. In the earlier ages of the English government, when per-sonal property was unimportant as compared with landed-estates, and the statutes of distributions and wills had not been passed, the personal property which a child could ac-quire called for no change in the general law, but so soon as the ordinary was compelled to distribute to the next of kin, and the wills of decedents were enforced by law, we might naturally expect that some mode would be devised to pre-vent the portion willed or distributable to an infant, from being squandered by his father or guardian. It is far from being clear that the ecclesiastical courts at that day did not

assert the right to appoint a *curator* for the personal estate which came to an infant through the medium of these courts, and it is quite probable it was lost in the continued assaults made on these courts, both by those of common law and chancery, from the time of the English Reformation down even to the last century. In a note by Mr. Thomas to his edition of Coke on Littleton, this subject is traced with much apparent accuracy through adjudged cases reported by Keble, Fitzgibbon and Levinz, as well as Dr. Swinburn's Essay on Wills. The latter claims jurisdiction for the ordinary to appoint a guardian for the personal estate when there was no other guardian by tenure or otherwise. In a case in prohibition as late as Lord Hale's time, he admitted the jurisdiction of the ordinary to appoint a *curator* for the personal estate. In another case, soon after his death, the claim was allowed so far as the infant's *portion*, but was denied as to his *person*. Sometime afterwards the claim was made broader, so as to appoint a guardian in all cases of wills for the *person and portion* whenever the infant was not in wardship by reason of some tenure. [See Thomas' Coke, 160.] If the jurisdiction, either general or limited, was afterwards exercised, it must have been unknown to Lord Hardwick, for in the case of Burk v. Draper, 3 Atk. 631, determined in 1746, he expresses great astonishment that the ecclesiastical courts should assume such a power, and recommended to the Attorney General to consider whether he ought not to proceed against the judge by *quo warranto.*

It is very evident the power to require such security from the father or any other common law guardian was proper to exist somewhere, and if not exercised by the ecclesiastical courts, the court of chancery was slow in taking the jurisdiction. The first case in the books is Holloway v. Collins, 1 Chan. Ca. 245, in 1674. The assertion of such a power for his court seems to have surprised the then Lord Keeper, for he at first denied the relief, when a legacy of £125 had been paid by the executor to the father, but afterwards granted it on learning the executor had protected himself by a bond of indemnity. The next case—Dagley v. Tolferry, 1 P. Wms. 285—was in 1715; there the payment was held bad, al-

though the circumstance was flung in, that the testator on his death-bed had virtually directed the payment to be made to the father. Lord Hardwick, in Philips v. Paget, 2 Atk. 80, decided in 1740, considered the last case as improperly ruled, and sustained a payment made to the father, on the ground in his case that the executor was compelled to pay the legacy within a given period, or forfeit some right under the will; but in Rotherham v. Fanshaw, 3 Atk. 627, some six years afterwards, the same judge conceded his court would allow an injunction, to restrain a father from suing in the ecclesiastical courts for his child's legacy. It was not until Lord Thurlow's time that the rule was finally settled in Cooper v. Thornton, 3 Bro. Ch. 96, 186. Since this, it seems not to have been questioned in England, and has been universally adopted in this country, as may be seen by the cases referred to by the petitioners.

It is possible, the father in his quality of guardian for his minor children, may be entitled to the possession of the real estates of his children when the title is cast on them by operation of law or by devise, where the possession is not controlled by its terms, subject to the common law liability to account for the profits, &c. [See Coke on Lit. 88, 89,a; 1 Black. Com. 461; King v. Oakley, 10 East, 490; King v. Welby, 2 M. & S. 504.] And there are cases as well as analogies, which seem to indicate the parent may in that capacity protect the personal estate of his child, when it has come to its actual possession during minority. [Smith v. Williamson, 1 H. & J. 147; Porter v. Young, 7 J. J. M. 501.] However this may be, and we purposely decline to express any opinion, it is evident from the cases previously examined, that a trustee is not warranted in paying over a money legacy to the father. We have found no cases in which the rule has been extended to personal chattels, but from the facility with which these can be removed and converted, it is reasonable they should be protected in the same manner as bequests of money.

2. It may be asked, why shall every executor be compelled to go into chancery to obtain the authority to pay the legacy of an infant to its father, when there is the cheap and more convenient orphan's court which might be invested

with the same power. The answer belongs to the legislative branch of the government, though it is a mistake to suppose a suit would be necessary for this purpose. The usual course is to apply to the chancellor by petition, and on its hearing, the necessary order would be made, investing the parent with authority to recover the legacy, on giving the proper security. [See 1 Smith's Ch. Pr. 653, *et seq.* and cases there cited.]

What has already been said is sufficient to indicate our opinion, that the delivery of the slaves in this case by the executor to the father of the petitioners, does not operate to discharge him from their claim for the legacy. The decree of the orphans' court, is therefore reversed, and the cause remanded.