Alston v. Alston.

---

## ALSTON *vs.* ALSTON.

[BILL IN EQUITY FOR SETTLEMENT OF GUARDIANSHIP.]

1. *Failure to perfect service of amended bill.*—The failure to perfect service of an amended bill on one of the defendants, from whom an answer to such amendment was required, is an error which will work a reversal of the chancellor's decree, at the instance of the defendants, although the omission seems to have escaped the notice of the chancellor and counsel in the court below.

2. *Validity of guardian's bond.*—Prior to the passage of the act of 1843, (Clay's Digest, 272, § 26,) the orphans' court had no authority to appoint a guardian of a child who had a living father; consequently, a bond taken by that court, prior to the passage of the act of 1843, from a father who was appointed guardian of one of his infant children, is inoperative as a statutory bond; and to render it valid as a common-law bond, it must be supported by a consideration.

3. *Authority of guardian by nature.*—A father has no authority, as guardian by nature of his infant child, to receive money or slaves belonging to the child; and if he receives such money or slaves, the chancery court will interpose, on a proper application, and require him to give bond with surety for the faithful discharge of his duties as guardian.

4. *Consideration of common-law bond of guardian.*—If a father, having been appointed without authority guardian of his infant son, and having thereupon executed a bond for the faithful discharge of his duties as such guardian, by virtue of such bond receives money or property belonging to the child, which he would otherwise have had no authority to receive, this constitutes a sufficient consideration to support the bond at common law.

5. *Condition of guardian's bond.*—The fact that a guardian's bond is conditioned for his faithful performance of the "duties of guardian *to* the said ward," does not show that the guardianship is restricted to the person of the infant.

6. *Liability of guardian and his sureties.*—Where a guardian has received a legacy for his ward from the testator's executor, including a portion of the proceeds of a sale of lands by the executor, neither he nor his sureties can avoid liability therefor to the ward, by setting up the invalidity of the executor's appointment, or his want of authority to make the sale.

7. *Allowance to father out of child's estate for education and maintenance.*—As a general rule, the father is bound to support his minor children, if he is able to do so, although they may have property of their own ; but, where he is unable to maintain and educate them suitably to their fortune, the chancery court will, on a proper application, make an allowance to him out of their separate property, either for their future education and maintenance, or as a reimbursement to him for past maintenance ; and in determining the question of the father's ability, it is proper to consider the amount of his estate, the number of his children, the condition of his family, his expenses and income, and the amount of his children's fortune.

8. *When statute of limitations begins to run as between guardian and ward.*—The statute of limitations does not commence to run against a ward, seeking a settlement in equity of his guardian's accounts, until the termination of the guardianship.

9. *When cross bill is unnecessary.*—Under a bill for the settlement of a guardian's accounts, the defendants can obtain the benefit of credits and matters of discharge by answer ; consequently, a cross bill is unnecessary, and cannot be supported.

APPEAL from the Chancery Court of Marengo.  •
Heard before the Hon. WADE KEYES.  •

THE bill in this case was filed by Nathaniel Y. Alston, against William J. Alston, his father, and the administrator of William Cade, deceased, who was his father's surety ; and sought a settlement and account of his father's guardianship. The property which went into the possession of said William J. Alston, as the guardian of said Nathaniel Y., consisted of slaves and money, and was bequeathed to said Nathaniel Y. by William B. Cade, his uncle, who died in Marengo county in March, 1835. The bequest to said Nathaniel Y. was a contingent remainder in certain lands and slaves, limited on the death without issue of Adolphus H. Cade, an infant son of the said testator, who died in July, 1835, without issue. The original bill alleged, that the will of said testator, William B. Cade, was admitted to probate by the orphans' court of said county, and that letters testamentary were granted by said court to Adolphus S. Cade, as sole executor; but an amended bill was afterwards filed, alleging that these proceedings were had in the circuit court of said county, on account of the relationship and consequent incapacity of the judge of the orphans' court.

No administration was ever had on the estate of said

Adolphus H. Cade, the deceased infant; but the executor of said William B. Cade, having sold the lands, under an order of the orphans' court, proceeded to make a final settlement and distribution of the estate among the remainder-men and other persons in interest; the complainant's father, as his guardian, receiving his share of the slaves and proceeds of the sale of the lands, as hereinafter stated. The order for the sale of the lands was made on the petition of the executor, which was filed in said circuit court on the 30th March, 1837, and which alleged that the lands could not be equally, fairly and beneficially divided without a sale ; but the order of sale was granted by said orphans' court, in December, 1838, after the matters connected with said estate had been transferred back to it.

On the 30th March, 1837, William J. Alston, as "natural guardian of his infant son," filed his petition in said circuit court; alleging that more than eighteen months had elapsed since the grant of letters testamentary to the executor of William B. Cade, and that his infant son, Nathaniel Y., was entitled to a portion of the estate under the provisions of the will; and praying that the slaves might be divided among the several persons in interest. On the 31st March, 1837, the day after this petition was filed, the circuit court made an order, appointing commissioners to divide the slaves among the several legatees, and directing the executor to " deliver to the several legatees, and to the guardians of such of them as are minors, their several distributive portions as allotted by said commissioners, upon their executing to him refunding bonds, with security, according to law;" and it was further ordered by the court, " that the guardians enter into bond and security with the clerk for their guardianship according to law." The bill alleged, that the circuit court, in granting this order, was exercising chancery jurisdiction; which allegation was denied by the answers.

On the 6th April, 1837, the executor delivered to said William J. Alston, as the guardian of his son, the slaves allotted to him by the commissioners, four in number. On the 10th April, 1837, said William J. applied to the

orphans' court of the county for letters of guardianship of his infant son, which were granted to him on the same day, and he thereupon entered into bond, with William Cade and Christopher H. Taylor as his sureties, payable to the judge of the county court, and conditioned as follows: "Now, if the said William J. Alston shall well and truly perform the duties of guardian to the said Nathaniel Y. Alston, his son, according to law, then the above obligation to be null and void." On the same day, the guardian returned to said orphans' court an inventory of the slaves which he had received from the executor, stating therein that he had received them as "natural guardian" of his son. Of the slaves thus received by said William J. Alston, one was sold by him in September, 1847, and the others, with their increase, were delivered to the complainant in November, 1850, after he had attained his majority. The bill sought to charge the defendants with the hire of all the slaves while they were in the guardian's possession, and with the value of the one which he had sold.

At the sale of the lands by the executor, above referred to, William J. Alston became the purchaser, and executed to the executor his notes for the purchase-money; but these notes were afterwards discharged, on settlement between him and the executor for the complainant's distributive share of the proceeds of the sale, by allowing the executor a credit for the amount due on them. The bill also sought to charge the defendants with this amount and interest, as for so much money received.

The original bill was filed on the 9th January, 1854. An amended bill was filed on the 13th March, 1854, and a second amendment on the 29th March, 1855. The defendants were required to answer the second amendment; but the record does not show that notice or service of it was ever perfected on William J. Alston, nor did he file an answer to it. Christopher H. Taylor, one of the sureties on said William J. Alston's bond as guardian, was alleged to be a non-resident, having no property or effects within this State, and was not made a party to the bill. William Cade, the other surety, was alleged to be

dead; and William C. Thompson, as his executor, was made a defendant.

Separate answers were filed by the two defendants, one on the 29th, and the other on the 30th March, 1854, each setting up substantially the same matters of defense. They insisted that the bond was void, because the orphans' court had no jurisdiction to take it; that the slaves went into the possession of William J. Alston, as guardian by nature only, and not under his appointment by the orphans' court; that the grant of letters testamentary to the executor was also void for want of jurisdiction in the court by which they were issued; that the order for the sale of the lands was void for the same reason, and that the sale did not divest the title of the devisees. They further alleged, that William J. Alston, with whom the complainant resided during his minority, and by whom he was supported and educated, was, for many years, greatly embarrassed in his pecuniary circumstances, with a large family dependent on him for their support, and, from these and other circumstances, was unable to maintain and educate the complainant in a manner suitable to his fortune; and they insisted that, in view of these facts, the said William J. was entitled to reimbursement out of the complainant's estate for the expenses incurred in his maintenance and education. They pleaded the statute of limitations, and demurred to the bill for want of equity.

On the death of William C. Thompson, the executor of William Cade, the suit was revived against N. B. Lesueur, as the administrator *de bonis non* of said Cade. The said administrator filed an answer, and afterwards a cross bill, setting up in each the same matters of defense which his predecessor had relied on in his answer.

On final hearing, on pleadings and proof, the chancellor held the complainant entitled to relief, dismissed the cross bill, and ordered a reference and account; instructing the master not to allow the guardian any sum for the maintenance and education of the complainant during minority, and to charge him with the complainant's portion of the proceeds of the sale of the lands.

The chancellor's decree is now assigned as error.

I. W. Garrott, and F. W. Siddons, for the appellants, made the following points:

1. The cause was not at issue on the final hearing, because service of the amended bill, filed the 29th March, 1855, had not been perfected on the defendant Alston, nor had he voluntarily appeared and answered it. This error must work a reversal of the chancellor's decree.

2. The bond of William J. Alston, executed on the 10th April, 1837, is void as a statutory bond, because at that time the orphans' court had no power to appoint a father guardian of his own son.—Hall v. Lay, 2 Ala. 529; Wood v. Wood, 3 Ala. 756; Lang v. Pettus, 11 Ala. 37; Poston v. Young, 7 J. J. Mar. 501.

3. The said bond has no validity as a common-law obligation, because it is not supported by a consideration. The appointment as guardian by the orphans' court, being void, cannot constitute a valid consideration for the bond. The bond was executed four days after the negroes were delivered to the defendant Alston; the negroes were delivered to him "as natural guardian" of his son; and it is not shown that he ever received any money or property of his ward by virtue of the bond.

4. The proceedings had in the circuit court, in the matter of the application by the defendant Alston for his son's distributive share of the slaves, cannot aid the bond. The record does not show that, in this matter, the circuit court was exercising chancery jurisdiction; and that fact cannot be assumed. If the proceeding was in chancery, it should have been commenced by bill.—3 Dan. Ch. Pr. 2076. But, even if the court acquired jurisdiction to make the order, the bond shows on its face that it was not given pursuant to the order, because it does not comply with the terms of the order.

5. The condition of the bond shows, that the defendant Alston was appointed guardian, not of the estate, but of the person of his son; consequently, the bond imposes no obligation on him or his surety in reference to the ward's estate.—2 Kent's Com. 227; Grimes v. Commonwealth, 4 Litt. 6, note, and cases therein cited; 2 Caines' Cases, 29, 57.

Alston v. Alston.

6. If the bond be valid for any purpose, it is a mere contract, under seal, between the parties thereto, and liable to the bar of the statute of limitations, which was complete before the filing of the bill.

7. The circuit court had no jurisdiction, in 1835, to admit to probate the will of William B. Cade, or to grant letters testamentary to his executor. This jurisdiction was then confided solely to the orphans' courts of the several counties, and the only exception in the statute was in reference to "settlements" by executors, administrators and guardians. Consequently, the sale of the lands by the executor, under the order of the orphans' court, which was granted on the application of the executor, was wholly void, and did not divest the title of the devisees. The record shows that the land was bought by defendant Alston, but no money was ever paid for it. The complainant is thus attempting to hold the surety of his guardian liable for the proceeds of the sale of this land, when the title to the land is still in himself, and no money has ever been paid or received on account of it.

8. Conceding that the bond is valid, and that it includes the infant's estate, it would only bind the obligors for the rents and profits of the lands. The guardian could not sell the infant's lands, even with the aid of the orphans' court, for any other purpose than to maintain the infant; and the parties could not have contemplated a change of the lands into money when they entered into the bond. Irvine v. McDowell, 4 Dana, 629; Grimes v. Commonwealth, 4 Litt. 1, and cases cited in note; 3 Humph. 592, 595; 5 Indiana, 350.

9. On the facts stated in the answers and proved, the defendant Alston was entitled to an allowance out of the complainant's estate, for his support, maintenance and education. A court of equity, on a proper application, would have granted such an allowance; and it will grant reimbursement for past maintenance whenever it would have authorized it in advance.—McPherson on Infants, 151; Patton v. Patton, 3 B. Monroe, 161; 5 Vesey, 194; 9 Vesey, 285; 14 Vesey, 449; 5 Vesey, 197; 3 Vesey, 10, 60; 5 Ala. 312; 5 Dana, 593; Hill on Trustees, 600.

WILLIAM M. BROOKS, and WILLIAM E. CLARKE, *contra.*
1. Formal objections, which, if they had been raised in the court below, might have been there remedied, are not available on error.—Johnson v. Culbreath, 19 Ala 348; Walker and Wife v. Smith, 28 Ala. 569; Holston v. Holston, 23 Ala. 777.

2. The failure to perfect service of the amended bill on the defendant Alston, is not available on error to his co-defendant, who voluntarily appeared and answered it without objection.

3. Although the orphans' court had no authority to appoint William J. Alston guardian of his infant son; yet the bond executed by him and his sureties, for the faithful performance of his duties as such guardian, is not void, but may be enforced in equity against him and his sureties, although the infant was no party to it.—Edmonds v. Morrison, 5 Dana, 224. But the fact that the bond is only valid as a common-law obligation, affects the remedy merely: the bond was conditioned for the discharge of the guardian's duties "according to law," and those duties and obligations are to be ascertained by reference to the statutes then of force.

4. The complainant's infancy would prevent the bar of the statute of limitations, if the statute were applicable to such a bond.

5. The evidence does not show that the negroes went into the guardian's possession before the execution of the bond; but, if such were the fact, it could not affect the validity of the bond, since he continued in the possession and use of the negroes, and received the profits thereof, for several years after the bond was made.

6. The validity of the executor's appointment, and of the sale of the lands, does not affect the question of the defendants' liability on their bond. The sale was made many years ago, and all parties interested have acquiesced in it. The defendants are not in a situation to insist on the invalidity of the sale. The claiming of the money by the complainant operates as a ratification of the sale, and the defendants are estopped from alleging that it was unauthorized.

7. The defendants do not show a state of facts entitling them to charge the complainant with his board and maintenance during infancy.—16 Ala. 737.

A. J. WALKER, C. J.—The decree of the court below must be reversed, because one of the defendants had never been served with any notice of, or subpœna to answer, a material amendment to which an answer by such defendant was required.

The fault for which we decide to reverse the case, seems not to have been observed by the chancellor or the counsel in the court below; and now, for the guidance of the chancery court in its future proceedings, we proceed to consider the questions reaching the merits of the case, which were decided by the chancellor, and, we suppose, discussed before him.

[2.] The most important question of the case is, whether the bond of Wm. J. Alston, as guardian of his infant son, given on the 10th April, 1837, is valid. In 1843, an act was passed, authorizing the appointment of guardians of the estates of infants, having living fathers. Clay's Digest, 272, § 26. Until that act was passed, the law of this State, as ascertained by the decisions of this court, denied to the orphans' court authority to appoint a guardian for the infant child of a living father.—Hall v. Lay, 2 Ala. 529; Wood v. Wood, 3 Ala. 756; Lang v. Pettus, 11 Ala. 37; Boyd v. Isaacs, 5 Porter, 388; Poston v. Young, 7 J. J. Mar. 501; Edmonds v. Morrison, 5 Dana, 223. Without renewing the discussion of the points involved in the decisions of this court above cited, we concede, as does the counsel for the appellee, so much of the argument for the appellants as assumes the invalidity of the appointment of Wm. J. Alston as the guardian of his infant son, by the orphans' court in 1837. From this concession it is a sequence, that we must regard the bond as taken by the orphans' court without authority, and inoperative as a statutory bond.

To render the bond valid as a common-law bond, it is requisite that it should be supported by a consideration. Sewall v. Franklin, 2 P. 493; Hester v. Keith, 1 Ala. 316;

Whitsett v. Womack, 8 Ala. 466; Gayle v. Martin, 3 Ala. 593.

[3.] If Wm. J. Alston has, by virtue of the execution of the bond, acquired no rights, and assumed or executed no trusts upon the strength of the bond, then the bond is without consideration. To determine whether the guardian has performed functions and exercised trusts by virtue of the execution of the bond, it is necessary to inquire what rights and what authority he had aside from those exercised by virtue of the bond. He was already the guardian by nature of his ward; but that guardianship, of itself, gave him no right to receive the slaves or money belonging to his ward; and a payment of the money or delivery of the slaves to him by the executor, without the execution of a suitable bond under the direction of the chancery court, would have been no discharge to the executor.—See the decision in Lang v. Pettus, 11 Ala. 37; Capel v. McMillan, 8 Porter, 198. It is but a legitimate amplification of the principle laid down in Lang v. Pettus, *supra*, that if an executor should make an unauthorized payment of money or delivery of slaves to the natural guardian, in the absence of a suitable bond for the protection of the ward, the chancery court would, upon application, require the execution of a bond with surety by the guardian. It follows from these principles, that the father of the complainant, as guardian by nature, had no right to receive his son's slaves or money, until a bond with surety had been given for the faithful discharge of his duties as guardian, and if he had received such money or property, the chancery court would at any time have interposed and exacted such bond with surety.

[4.] The circuit court, which, in 1837, exercised chancery jurisdiction in this State, in the order directing a division of the slaves among the legatees, of whom complainant was one, required that the guardians of the minor legatees should execute bonds with surety "for their guardianship according to law." The bond in controversy was given within a short time after that order.

The father of the complainant received money, and exercised the functions of a guardianship as to slaves.

He could only have been authorized to do so upon the execution of bond with surety. The bond, which he did execute, being precisely such a one as the law would have required, must be regarded as supported by a consideration. In the case of Edmonds v. Harrison, 5 Dana, 223, a question identical with that which we have been considering, was decided; and the bond was held to be supported by a consideration, and to be valid as a common-law bond. That decision is in harmony with the principles which have been applied in other cases, where the validity of other judicial bonds voluntarily executed has been passed upon. Thomas v. White, 12 Mass. 368; United States v. Trigey, 5 Peters, 115; United States v. Maurice, 2 Brock. 96; Crawford v. Stephens, 1 Kelly, 574; S. C., 3 Kelly, 499; Crawford v. Howard, 9 Geo. 314; Iredell v. Barbee, 9 Iredell, (N. C.) 258.

[5.] The bond given by Wm. J. Alston was conditioned, that he should "well and truly perform the duties of guardian *to* the said Nathaniel Y. Alston, his son, according to law." It is contended, that the undertaking of the obligors for the discharge of the duties of a guardianship "*to*" the ward has reference alone to a guardianship of the person. We do not so. interpret the language. A guardianship "*to*" the ward can be restricted to a guardianship of the person, with no more reason than a guardianship "*of*" the ward. Guardianship "*of*" the ward is, no doubt, the more accurate expression; but, when understood in their ordinary acceptation, the expressions are not distinguishable in their meaning. Guardianship "*of*" the ward would not be limited in its meaning to guardianship of the person, and for the same reason guardianship to the ward should not be so limited. To construe the bond as pertaining to a guardianship of the person, would allow it no effect, and would make the act of giving it vain and useless. To construe it as securing the faithful discharge of the duties of a guardianship of the estate of the ward, gives it effect, and concedes to it a purpose.

[6.] If it be conceded, that the appointment of the executor, from whom the complainant's guardian received

his legacy, was void; and that the order for the sale of the land by the executor was also void, the liability of the guardian and his sureties will remain unaffected. For it was as much the duty of the complainant's guardian to demand and receive the complainant's legacy from an executor *de son tort*, as from a rightful and legally appointed executor; and although the sale of the land by the executor may have been unauthorized, yet it would be competent for the complainant to ratify the sale, and to take his proper share of its proceeds, So, it would be competent for him to approve the act of his guardian in taking his proper share of the proceeds of the sale, and· to charge him and his sureties therewith. The guardian having received the money for his ward, and as belonging to his ward, it does not lie in his mouth to say that the. sale from which the money arose was void, if the ward ratifies such sale. If the guardian has wrongfully taken up his own debt, instead of collecting money properly coming to his ward, he thereby misappropriates that amount of his ward's estate, and becomes liable therefor.

[7.] The answer of Thompson, the executor of Wm. Cade, (the surety of Wm. J. Alston,) alleges ·that Wm. J. Alston had six children, besides complainant, and a wife; that his wife was sick for many years; that her sickness rendered it necessary that she should be carried by. her husband to Philadelphia, Lexington, and Louisville, and other places; that great expenses, absences from home, and neglect of business, deficient crops, serious embarrassment, and inadequacy of income to meet expenses, resulted; and that situated as he was, Wm. J. could not support and educate his other children, in a manner equal to that in which the estate of the complainant, without aid from his father, would have justified complainant's being supported and educated. William J. has become, and is now, unable to pay his debts, and is insolvent; a large portion of the indebtedness existing from about and before the time he obtained the property of complainant. The subsequent answer of Lesueur, the administrator *de bonis non* of the estate of Wm. Cade,

and the answer of Wm. J. Alston, are substantially the same on this point.

It is a general rule of law, that the father is bound to support his minor children, if able to do so, even though they have property of their own.—2 Kent's Com. 191; 2 Story's Eq. Jur. § 1354; Pharis v. Leachman, 20 Ala. 685; Bethea v. McCall, 5 Ala. 308. If the father is unable to maintain his infant child, having an independent estate, the chancery court will, upon an application by the father, make an allowance to him for the maintenance of such infant.—Watts v. Steele, 19 Ala. 656; Osborn v. Van Horn, 2 Florida, 360; In the matter of Burk, 4 Sanf. Ch. Rep. 617.

The court of chancery does not confine itself to the making of an allowance for a prospective maintenance, but will, in a proper case, allow a reimbursement to the father for the past maintenance of the infant.—Stewart v. Lewis, 16 Ala. 734; Montgomery v. Givhan, 24 Ala. 568–588; Osborn v. Van Horn, *supra;* Patton v. Patton, 3 B. Monroe, 160; Heysham v. Heysham, 1 Cox, 178; Hughes v. Hughes, 1 Brown's C. C. 387; Andrews v. Partington, 3 *ib.* 60; Greenwell v. Greenwell, 3 Vesey, 194; Reeves v. Brymer, 6 Vesey, 425; Sisson v. Shaw, 9 Vesey, 285; Maberly v. Turton, 14 Vesey, 499; *Ex parte* Bond, 2 Myl. & K. 439; Clay v. Pennington, 8 Simons, 359. Reason suggests, as the criterion for determining when an allowance for past maintenance should be made, the inquiry, whether a chancery court would have authorized it in advance. If, then, a father was unable to make the contribution to the maintenance of his infant child, at the time when it was made, the chancery court will reimburse him.

We thus reduce the question of Wm. J. Alston's right to a credit for the maintenance and education of the complainant to this: was he able to maintain and educate him as he did? To determine this question, it is necessary to inquire what is meant by ability to maintain the infant.

In Watts v. Steele, 19 Ala. 658, this court said, that the making an allowance to the father does not depend

upon his insolvency, but upon his inability to (support and) educate the child suitable to his fortune; that the father's ability was to be estimated comparatively; that his income, the size of the family dependent on him for support, his physical inability, from disease, &c., to exert himself, should be taken into the estimate; and that if, in view of these circumstances, it should appear to be reasonable to make an allowance, and for the benefit of an infant, the court should order it. Upon that authority, as well as upon those cited below, we conclude that, in determining the question of the father's ability to maintain and educate his son, it is proper to consider the amount of his estate, his income, the number of other children dependent upon him, his expenses, the loss of time and money, and the expenses growing out of proper efforts to restore or alleviate the affliction of his wife, and the amount of the son's fortune.—Macpherson on Infants, 222, 223, (41 Law Library, 151–152;) Hoste v. Pratt, 3 Vesey, 730; Allen v. Coster, 1 Beavan, 204; In the matter of Burk, 4 Sandford's Ch. 617; 2 Lead. Cases in Eq. (2 part,) 171; In re Stables, 13 Eng. Law and Eq. 61; Osborn v. Van Horn, supra; Myers v. Myers, 2 McCord's Ch. 255; Dupont v. Johnson, 1 Bailey's Eq. 281.

The answers show that the parent guardian in this case was pecuniarily embarrassed during the guardianship; that debts, existing at the commencement of the guardianship, continued in some form during its entire duration; that shortly after the guardianship terminated, the guardian became insolvent; that his income was unequal to his expenses; that the protracted illness of his wife produced great expense and loss of time, and consequent diminution of income as compared with the outlay; that he had six other children to be reared and educated; that he was unable to educate and maintain his children in a style comporting with the complainant's fortune; that he has endeavored to support and educate the complainant in a manner suitable to his degree and condition in life; and it appears from the bill itself that the complainant had a very considerable fortune independent of his father. The answers being such, and the proof conducing to

support the answer, the chancellor should not, by his decree, have denied all compensation for the past maintenance and education of the complainant, but should have referred it to the register to inquire and report whether the guardian should, upon the principles hereinabove laid down, receive any allowance for the past maintenance and education of his son.

[8.] The statute of limitations could not commence running against the complainant, until the termination of the guardianship.—Taylor and Wife v. Kilgore, 33 Ala. 214; Eiland v. Chandler, 8 Ala. 781.

The appropriation of his ward's slaves to his own use by the guardian was without any adequate excuse, apparent either from the allegations of the bill, or from the proof; and he was, therefore, properly charged with their hire.

[9.] The cross bill asked for no relief to which the complainant was entitled, that could not be procured under the answer. The chancellor did not, therefore, err in dismissing it. Cross bills are not necessary for the obtainment of credits, or mere matters of discharge. Goodwin v. McGhee, 15 Ala. 233.

For the errors pointed out, the chancellor's decree is reversed, and the cause remanded, for further proceedings in pursuance to the foregoing opinion.