# Cooley *v.* Stringfellow.

## *Bill to Establish Resulting Trust.*

(Decided Dec. 14, 1909.—51 South. 321.)

1. *Parent and Child; Support and Education of Child.*—Although primarily, a father is bound to support and educate his child if he is able to do so, yet, if he is not able and the child has an estate, assistance would be granted the father out of such estate.

2. *Same; Support of Parent by Child.*—If the parent is unable to support himself and the child is able to support the parent, it is the child's duty to do so.

3. *Same; Support of Child.*—Where the child has an estate and the parent has none the child should be supported out of its own estate.

4. *Same; Gifts Between; Validity; Presumption.*—In the absence of undue influence or parental duress, a child may give its property to its parent; but as it is presumed that a child is under the influence of the parent, the burden of proof is on the parent to show that there was no parental duress or influence in procuring the gift.

5. *Gifts; Validity; Burden of Proof.*—Where a father takes a gift from a child he has the burden of showing the validity of the transaction by showing not only that the child understood the transaction and that the act was in accordance with the intention of the child, but how that intention was induced, what influence, if any, was exerted, or that the gift was for the benefit of the donor and not the donee.

APPEAL from Etowah Chancery Court.

Heard before Hon. W. W. WHITESIDE.

Bill by Mattie I. Stringfellow against her father, H. R. Cooley, to establish a resulting trust in land. Decree for complainant and respondent appeals. Affirmed.

CULLI & MARTIN, for appellant.—In order to establish cases of the character here sought the evidence must be clear and strong, unequivocal, and must establish the fact of the payment by the alleged beneficiary beyond doubt.—Pom. Eq. Sec. 1040-1041; *Dooley v.*

*Pinson,* 39 South. 668; *Lehman v. Lewis,* 62 Ala. 129; *Tilford v. Torey,* 53 Ala. 120; *Bibb v. Hunter,* 79 Ala. 358; *Allen v. Young,* 88 Ala. 340; *Westbrook v. Hays,* 137 Ala. 572. The case made by the bill seeks to establish a parol trust in land, which of course, cannot be done.—*Patton v . Beecher,* 62 Ala. 579; *Manning v. Pippin,* 95 Ala. 541; *Allen v. Caylor,* 120 Ala. 251; *Boykin v. Newman,* 121 Ala. 311; *Oden v. Lockwood,* 136 Ala. 517. Counsel also cite authority to show that there can be no relief without allegation although established by the proof, and the contrary of the proposition that there can be no relief without proof, although there be allegation.

KNOX, ACKER & BLACKMON, for appellee.—After a lengthy discussion of the evidence counsel cite in support of the decree of the chancellor the following.— 4 Mayf. Sec. 238; Pom. Eq., Secs. 1037, 1040; 10 A. & E. Ency. of Law, 30; *McCall v. Rodgers,* 77 Ala. 352; *Mobile L. I. Co. v. Randall,* 71 Ala. 221; *Emanger v. Emanger,* 137 Ala. 339; *Sandford v. Weeden,* 2 Heisk. 76; *VanBuskirk v. VanBuskirk,* 148 Ill. 9; *Ryder v. Emrich,* 104 Ill. 470; 1 Perry on Trusts, Sec. 137.

MAYFIELD, J.—This is a sad and unfortunate case. It is a suit by a child against her father, and seeks to decree and enforce a resulting trust in and to certain lots, and the houses thereon, in the city of Gadsden, Ala. The bill charges that the father, under an agreement with the daughter, invested her money in the purchase of these lots and in erecting the houses thereon, and took the title thereto in his own name, and now refuses to recognize the trust, or to convey the property to her, and is attempting or is in the act of selling and conveying the same for his own benefit and

for the purpose of depriving her of her property. The answer of the father denies the equitable allegations of the bill, and answers and swears that the daughter gave him $4,000 as an absolute and unconditional gift, and that with' this money given him by her, together with other funds of his own, he purchased the lots and built the houses in question; but admits that she furnished $900 with which to erect a house on two of the lots for himself under an agreement to share equally as to the two lots and house after it was erected. While it is not conceded entirely by the father, we think the evidence indisputable shows that the lots were purchased and the houses built exclusively out of the funds which the daughter received under the will or bequest of her uncle, a half-brother of her father. The daughter had received some property or funds from the estate of her grandfather, and her uncle was her legal guardian as to this fund, until his death, when, it seems, he left a considerable estate to each of respondent's three children by his first wife, but none to the respondent, his wife, or his children by his last wife.

The father and children seem to have been people of small means, but were industrious and lived well. Neither father nor daughter had any estate of material consequence until the daughter acquired by the will of her uncle this estate of more than $14,000. The father was, of course, her natural guardian till her marriage, which occurred September 3, 1906, and was appointed her legal guardian upon the death of her uncle who left her the estate. As such legal guardian he received her legacy in June, 1906, and at once had instituted in the chancery court proceedings to have her disabilities of nonage removed, which were accordingly so decreed; and on the 14th of July (a little more than a month after receiving her legacy as guardian) he made his

first settlement as guardian—paying over to his daughter and legal ward more than $13,000—and was discharged as such guardian. On this very date, at the very time he paid over to her the $13,00 and more, she paid to him a check for $4,000, which check is the real subject of dispute in this litigation—the daughter claiming that she paid it to him under an agreement that he should invest it in real estate in Gadsden, Ala.; while the father claims that it was a bona fide and absolute gift by his daughter to him.

If this was an absolute, valid, and bona fide gift to the father, then the complainant is not entitled to relief, except to the extent admitted by the respondent in his answer; that is, to a half interest in the two lots, as to which funds were used in constructing the houses thereon under the alleged agreement to share equally in the lots after the improvement. The father's theory of the case is corroborated by his and his daughter's attorney, Mr. Strange, who conducted the settlement of the guardian, and also conducted the proceedings to have the daughter's disabilities of nonage removed, to the effect that the daughter told him she was going to give her father something out of the legacy, but named no amount, and that the father told him she was to give him $4,000. He is also corroborated by one Baird, who seems to have represented a surety company, who made the father's bond as guardian, and who seems to have supervised or assisted in the settlement of the guardianship. He says that when the daughter delivered the check for $4,000 to her father, she said "that she was giving this to her father, and that she thought he deserved it."

The wife of the father, stepmother of the daughter, and Sumner Spain and Tressie Spain, relatives of the stepmother, were at the father's house at the time the

[Cooley v. Stringfellow.]

father and daughter returned from Birmingham to Gadsden, on the night of the day of the final settlement and the day she delivered the check to her father, each testified to declarations of the daughter that she had given her father $4,000, all of which the daughter stoutly denied. Straightway after the 14th day of July a number of lots were purchased in Gadsden by the father. The title to two of these (the most valuable) were taken in the name of the daughter, and as to these she drew the checks herself, except that for the $550 balance, which the father drew. He claims that this was his own money, which his daughter had given him, she claiming that the father simply used this $550 of the $4,000 as a part of the agreement, saying it could as well be used on this as for payment on the other lots. The titles to the other lots were taken in the father's name, and he spent a part of the $4,000 in building houses thereon, and the daughter advanced other amounts, aggregating $900 or more, towards the erection of houses thereon, and the purchase of other lots, as the daughter says, carrying out the original agreement with her father. The father contends that this $900 was advanced under subsequent agreement to build houses on two of the lots purchased for himself, because he did not have the money, and that he agreed that on this account the daughter should have a half interest in these two lots. A great many witnesses—most of them members of the family, the daughters, sisters, husband, and brother-in-law—testified that statements of the father before and after the purchase were to the effect that they were all for his daughter; that he pointed out the lots to each of them as his daughter's property, saying that he had bought them for her and was having the houses built on them for her, and made these statements while going over the property and

showing same to the witnesses; that he did not claim
any one of them, but spoke of them all as his daugh-
ter's property, and was boasting as to what a good in-
vestment he had made for her, that it would pay her
12 per cent. on the investment.  All of this he denied
most strenuously.

The daughter was married in September after the
transactions in July.  It seems that no trouble arose
until in January, 1907, when the daughter and her hus-
band demanded the deeds and papers, the father refus-
ing to deliver them, and they say that for the first time
they then learned that the titles to some of the lots
were in the name of the father.  The daughter says that
her father at first promised to deliver the deeds to her,
and made no objection or refusal to do so, but put her
off for one reason and another, saying that the deeds
were in the courthouse and were safer there than they
would be elsewhere; that her husband then demanded
the deeds of her father; that they had some words about
them, and the father said he did not know that
she and her husband could get the deeds, and, as she
says, for the first time claimed that the lots were his,
and that she had given him the $4,000 absolutely.  This,
of course, was denied by the father, his wife, and Miss
Spain; and they testified that the daughter had seen
the deeds, and knew of their contents before, and had
not objected, that at one time they were kept in her hat
box, but the testimony of the clerk in the probate of-
fice tends to show that all the deeds remained in the
probate office from the time they were filed till Janu-
ary, 1907, about the time the father declined to deliver
them, and (as the daughter says, for the first time)
claimed the lots as his own.  It is impossible to recon-
cile this evidence as to the gift.  Besides, the evidence
referred to her was evidence of expressions of the

30—164

daughter to the effect that she desired to give her father a part of her legacy, and the daughters all say they intended to do so, and that they agreed among themselves to buy their father a home, and offered so to do —that is, to give him one of the plots bought for the complainant, as to which the title was taken in her name, known as the 'Voight Place"—but that he declined it because they desired to deed it to him during his life, and, after his death, to his children by his second wife, their half-brothers and half-sisters.

Thus is the case made a hard and difficult one. Because of the great conflict in the evidence, and because of the relations of the parties to the transaction, it is hard to find wherein the exact, the whole truth, lies. It is, however, made certain that in law and in equity this property is or ought to be the daughter's, unless she did make an absolute gift, binding in law and equity, of the $4,000 evidenced by the check from her to her father on July 14, 1906, the date upon which he made the final settlement as her legal guardian. But for the evidence tending to show gift unquestionably the complainant would be entitled to relief. It is likewise beyond question that the daughter drew the check for $4,000 in favor of the father, but it is not certain that it was intended as an absolute gift. The use to which the father put it, as well as all his subsequent acts, shows that he applied it to the purpose for which the daughter says it was intended; the difference being that the father says it was for himself, and the daughter, that it was for her, and their respective witnesses, corroborating each, differ as widely, one set from the other, as the daughter and father. • The evidence being so in conflict, the law must be appealed to, to settle the respective rights of the parties in the matter.

[Cooley v. Stringfellow.]

A father is primarily bound by the laws of the land, of nature, and of morals to support and educate his children during their minority; but, when he had not the ability so to do, in accordance with their station in life, assistance will be granted him from their private estates, if such they have.—*Beasley v. Watson,* 41 Ala. 234; *Alston v. Alston,* 34 Ala. 15; *Greenwood v. Coleman,* 34 Ala. 150; *Watts v. Steele,* 19 Ala. 656, 54 Am. Dec. 207. To this end, and for this reason, the parent is entitled to the service of the children during minority, and it is therefore likewise the duty of the child to support the parent if the parent is unable to support himself and the child is able so to do. If the child has an estate and the parent none, the child should be supported out of its own estate.—*Stewart v. Lewis,* 16 Ala. 734; *Bellamy v. Thornton,* 103 Ala. 409, 15 South. 831; Code, § 1614 (3233); *Jones' Case,* 130 Ala. 456, 30 South. 586; *Myers v. Myers,* 2 McCord, Eq. (S. C.) 214, 16 Am. Dec. 648. A child may give its property to its parent, and the gift is effectual, if not influenced by parental duress. The law presumes that the child is under the influence of the parent, the latter being construed to be the stronger of the two; and hence in cases of gift from child to parent the burden of proof is upon the donee to show that there was no parental duress or influence, that the gift was wholly voluntary, and it is sometimes held that this cannot be done, except by showing that the child had independent advice, but we apprehend the better rule to be that the presumption of undue influence may be rebutted by any competent and sufficient evidence, but that it must be rebutted for the gift to be valid and enforceable against the child.—14 Am. & Eng. Ency. Law, p. 1036. To maintain a gift from a minor child to the father, it must appear that the child understood the nature and

effect of the gift, and that he was not under undue parental influence.—*Turner v. Collins,* L. .R. 7 Ch. 329.

It was said by the New York Court, long ago, in the case of *Bergen v. Udall,* 31 Barb. (N. Y.) 9 (we quote head notes of opinion).: "Where a daughter, immediately upon her arrival at lawful age, makes a voluntary conveyance for the benefit of her father, the transaction will be examined by the court with the most jealous scrutiny and suspicion. The person relying upon the conveyance must show affirmatively, not only that the one who made it understood its nature and effect, and executed it voluntarily, but that such will and intention was not in any degree the result of misrepresentation or mistake, and was not induced by the exertion for selfish purposes, and for his own exclusive benefit, of the influence or control which the father possessed over his daughter. There is no law against a child bestowing upon a parent any property of which she may be the owner because she loves him, and desires to promote his interests. But there is an inflexible principle both of public policy and private justice which forbids a parent making use of his influence, or his child's affection, to impose upon her mind a purpose of bounty to him." In this same case the court quotes from Lord Langdale, M. R., as follows: "If there be a pecuniary transaction between a parent and child and just after the child attains the age of 21 years, and prior to what may be called a complete emancipation, without any benefit moving to the child, the presumption is that an undue influence has been exercised to procure that liability on the part of the child, and it is the business and duty of the party who endeavors to maintain such a transaction to show that that presumption is adequately rebutted, and that it may be adequately rebutted is perfectly clear. This court does not interfere to pre-

vent even an act of bounty between parent and child, but it will take care (under the circumstances in which the parent and child are placed before the emancipation of the child) that such child is placed in such a position as will enable him to form an entirely free and unfettered judgment, independent of any sort of control. The question then is whether, under the circumstances of this case, we have any evidence of that kind." For the want of such evidence, the transaction was set aside. The case at bar is certainly very similar to those above referred to.

The following rule of law and evidence is firmly settled in cases like the one in question, coming down to us, as it does, in an unbroken chain from Lord Elder's decisions: Where a father takes a gift from his child he must assume the burden of proving the transaction righteous, by showing, not only that the child comprehended the transaction, fully understood it, and that the act was the exact and correct intention of the donor, but how that intention was induced, what influence (if any) was exerted in procuring the gift, or that it was for the benefit of the donor and not of the donee. Courts watch such transactions with great jealousy. The parent in such cases must observe the best of faith —"uberrima fides." The weaker party must be put and kept upon an equal footing with the stronger, and the courts must do this. In the case of *Davis v. Davis*, 4 Giff. 417, it was held that where a daughter shortly after becoming of age gives to her father, who acts as her guardian, a large part of her property, the gift should be set aside. In a similar case—*Wright v. Vanderplank*, 8 Deg. M. & G. 133—upon a state of facts very much the same as that in the case last cited and as that in the case at bar, the same rule was applied and made just after the donor had arrived at majority; and the

court held that the transaction, having had its inception at a period of time when minority had just terminated and while the parental authority was in full force, and having been consummated without the benefit of independent advice to the donor, was impeachable after its completion and the delivery of the property. In this case the alleged gift was made at the very earliest practical moment. Immediately upon the attainment of majority, and the consequent legal right and power to dispose of this property, the daughter gave nearly one-third of all she possessed to the one person in the world who exercised the greatest control and influence over her. It was the very first business act of her life; no doubt, from the evidence, her disabilities were removed hastily for this purpose. We cannot escape this conclusion. Why such haste, when she would naturally have been of age within a very short time? Her father, the donee, was both her natural and her legal guardian. The father sought this proceeding, and it certainly requires some proof to explain this hasty act—the very first business act of the daughter's life—by which, according to his evidence, she gave him nearly one-third of her estate, though he was not in financial need; notwithstanding that according to his daughter's testimony he was in such need. Here, in this instance, the evidence of each is for the other, but equally conflicting, as if for their own benefit.

The averments of this bill are a sufficient basis for the award of the relief granted, and a separate bill was not necessary.

We are not prepared to say that the chancellor was in error in finding the transaction not to be a gift; and say what is uttered in the foregoing paragraphs merely in answer to appellant's argument as to a variance. We do not think there was a variance, and hence do not

[Crausby, et al. v. Crausby, et al.]

decide that the relief could have been granted, if the gift had been found to have been made.

The decree of the chancellor is affirmed.

Affirmed.

ANDERSON, McCLELLAN, and SAYRE, JJ., concur.