# Nelson, Adm'r, v. Beck.

### *Trover for Conversion of Slaves.*

*Conversion of slaves; what act constitutes.*—K died testate in this State, and S qualified as executor in 1853. Under a clause of the will, B, a minor of tender years, having no guardian, but residing under the care of his father in a neighboring county, became entitled to certain slaves, and S delivered them to B's father, taking his receipt showing that they were delivered as the property of the son, and the slaves were from that time recognized and kept on the father's plantation, as the property of the son, until his death in 1864, and remained there until emancipated by the results of the late war. B never had any guardian, and neither S, the executor, nor B's father, or any one else, laid any claim to the slaves, but, on the contrary, always recognized his right to them. S, dying afterwards, and the minor becoming of age, without any demand made upon S in his life, brought an action of trover for a conversion of the slaves, against the administrator of S.

Held: The action was well brought.

Manning, J., (dissenting) held, that the delivery of the slaves was made in good faith, with a view of doing the owner a kindness; that considering the nature of the property, the disposition made was preservative of it; and having been delivered and held (until emancipation) in a situation to be forthcoming when the minor reached majority, and in strict recognition of his rights, no inconsistent dominion or claim having been exercised or asserted over them, and no demand having been made; there was no repudiation of the right of the minor to the slaves, or exercise of dominion over them inconsistent with those rights, and hence there was no conversion.

APPEAL from Circut Court of Dallas.

Tried before Hon. M. J. SAFFOLD.

William R. King Beck brought his action of *trover* against Nelson, as administrator, with the will annexed, of Alanson Saltmarsh, for the conversion of fifteen slaves by the latter on the 13th day of January, 1854. There was a trial and verdict, resulting in judgment for the plaintiff for $5,258.99, and the defendant, having reserved exceptions, brings the case here by appeal.

William R. King, a resident of Dallas county, died testate in 1853, and his will was duly admitted to probate in that county on the 11th day of May of that year.

Under a clause in the will the plaintiff was entitled to some fifteen negro slaves. Saltmarsh was the only one of the persons, nominated as executors, who qualified, and he, on the. 13th day of January, 1854, delivered the slaves to Franklin Beck, the father of plaintiff, taking a receipt as follows: "Received of A. Saltmarsh, executor of the estate of the late William R. King, twelve negroes, being half the remainder and excess referred to in his will, and which were given to me as a legacy by him, in said will. It is understood and agreed, that in the event of any claims arising against said estate, so that in their settlement it becomes necessary to have more money than will be realized from the sale of personal property, I am to contribute my *pro rata* share of the same, in proportion to the value of my legacy from said estate. Jan. 13th, 1854.

(Signed,)            Wm. R. King Beck,

                 By F. K. Beck, guardian.".

Franklin K. Beck took the slaves to his plantation in Wilcox county in this State, always recognizing them as the property of the son, and worked them as' such, with other slaves, until his death in 1864. After that they continued on the plantation, still recognized as the son's property, until freed by the results of the war in 1865.

At the time of the delivery of the slaves, plaintiff was a minor, not quite five years old, residing with his father. No guardian was ever appointed for him. He became of age in May, 1870, and brought this action on June 26th, 1872. It does not appear when Saltmarsh died, or that any demand was ever made upon him.

It was shown that Saltmarsh had made distribution of all the testator's negroes, according to the bequests of the will, delivering to each legatee the number bequeathed him. One of the negroes died, without fault on part of any one, while on Franklin Beck's plantation.

Among other evidence, the defendant introduced the in-

ventory of the property of the estate, and the record of the final settlement made by Saltmarsh of King's estate, in the probate court of Dallas, &c., and offered to introduce as evidence other papers found among the papers relating to the estate, which, on motion of plaintiff, were excluded, and defendant excepted. In the view which the court took of the case, it is, however, unnecessary to refer further to this exception.

The court, at the instance of plaintiff, charged the jury, in substance, as follows: 1st, That the father of an infant, not his guardian, had no authority to receive property bequeathed to the infant; and if the executor make such delivery, and thus part with his dominion over the property, in a manner not authorized by law, he violates his trust, and is guilty of a conversion of the property, although he may not have had any bad intent. 2d, If the jury find that Saltmarsh, as executor, divided the slaves belonging to King, among the legatees, according to the bequests in the will, and allotted and set apart as the property of plaintiff, the slaves mentioned in the complaint, and assented to the plaintiff's legacy under the will, and delivered the slaves, in 1854, to Franklin K. Beck, under the receipt read in evidence, and that said Beck was not plaintiff's guardian, then Saltmarsh, by such delivery, was guilty of a conversion of said slaves, and a cause of action then accrued in favor of plaintiff against Saltmarsh for such conversion. The defendant duly excepted to each of these charges. The defendant then asked fifteen written charges, each of which were refused, and defendant excepted. Among these charges were the following: "If the jury believe that Saltmarsh delivered the property to plaintiff's father, believing that he was performing his duty as executor, and acting for the interest and in accordance with the legal rights of the plaintiff, and that he did not intend thereby to deprive the plaintiff of it, but meant in good faith to preserve and maintain the plaintiff's right to the property, and that said Beck so kept it for the use of the plaintiff, until the slaves were emancipated or died, without fault on the part of said Saltmarsh, or said Beck, then such delivery was not a conversion." Another of these charges instructed the jury, if upon the facts recited in the above charge, the plaintiff, while yet a minor, prior to the death of one of the slaves, and the emancipation of the others, "made no demand upon the executor, through a duly qualified guardian of his property, for these slaves, then such delivery to said Franklin K. Beck, and his holding them under the circumstances named, would not be inconsistent with the rights of the plaintiff, and he cannot recover in this action."

The other charges refused, were similar to those above set out, instructing the jury, in varying language, that if the delivery of the slaves to Franklin Beck, was with the intention of doing plaintiff a kindness, and preserving the slaves for him, and was such a disposition of them as was safe and prudent, and no inconsistent dominion or title was ever asserted over the slaves, but they were all the time kept ready for delivery to the minor on arriving at age, then plaintiff could not recover.

The charges given, at the plaintiff's instance, and the refusal to charge as requested by defendant, are now assigned as error.

BROOKS, HARALSON & ROY, for appellant.—To support an action of trover, there must be a positive *tortious* act, done with the intent to deprive another of his property, or to reap some benefit to the party committing it, against the interest of the party owning the property.—*Jones v. Allen,* 1 Head. (Tenn.) 626; *Glover v. Reddick,* 11 Iredell, 588; 6 Bacon's Ab. p. 680.

If the disposition of the thing for which the action is brought was made to do a kindness to the party who owned it, and without any intention of injury to it, or of converting it to the defendant's own use, and under these circumstances, any misfortune happened to the thing, it cannot be deemed an illegal conversion; but, as it would be a justification in an action of trespass, it would be a good answer to an action of trover.—6 Bacon's Ab. 680; *Drake v. Shorter,* 4 Esp. 165.

Whoever undertakes *tortiously* to deal with the property of another *as his own,* or *tortiously* detains it from the owner, is, in contemplation of law, guilty of a conversion.—*Conner & Johnson v. Allen & Reynolds,* 33 Ala. 516; *Watt v. Potter,* 2 Mason, 77.

A conversion, in the sense of the law of trover, consists either in the appropriation of the thing to the party's own use and beneficial enjoyment, or in its destruction, or in exercising dominion over it, *in exclusion or defiance of the plaintiff's right,* or in withholding the possession from the plaintiff, *under a claim of title inconsistent with his own.*—2 Greenl. on Ev. § 642; *Conner & Johnson v. Allen & Reynolds, supra.*

The above definition of conversion, extracted from one of the authorities cited, is a correct and exhaustive definition of the subject, and when applied to the case at bar, is conclusive, as we submit, against the complaint of the appellee.

But the use, or disposition or detention of a thing, might be a *tort* under one circumstance, and might, if done under others, assume a different appearance; as, for example, if

[Nelson, Adm'r, v. Beck.]

the use, disposition or detention, was to do a kindness to the owner, and without any intention of injury to the thing, or of converting it to the use of the person using, disposing of or detaining it, and was merely conservative of it, and consistent with the right of the owner and his dominion over it.—2 Greenl. on Ev. § 643; *Conner & Johnson v. Allen & Reynolds, supra.*

A line of authorities has been referred to, by the counsel for appellee, to show where the action of trover may be maintained, and which are supposed to be against the appellant—such as, where a warehouseman or common carrier delivers goods by mistake to the wrong person; or, where one hires a horse to go to a place agreed on, but goes to another place in a different direction; or, where one hires a horse to go to an agreed distance, and he goes beyond that distance; or, if one entrusted with the goods of another, put them in the hands of a third person, contrary to orders; or, if a person take my horse to ride and leave him at an inn, and thereby bring a charge upon me; or, if a bailee or carrier, who undertakes to deposit flour at a particular place, but wilfully, and of his own accord, leaves it at another place, where it is innocently taken by a third person; but, in all these instances, and in every other one, of which the above cases are illustrative, the action is supported because of the *positive, wrongful* act of the defendants, inconsistent with their undertakings, done with no intention to benefit the plaintiffs and to preserve the property, and which resulted directly to the injury of the plaintiffs.—*Bullard v. Young,* 3 Stew. 46.

In striking contrast with this line of decisions, but not in conflict with them, we have another class of cases, where the facts are more like those in the case at bar, and in which the principles decided are more directly in point.

In *Morgan, Adm'r, v. Nelson, Adm'r,* 43 Ala. 586, Vasser, Morgan's intestate, was guilty of acts which would ordinarily constitute a conversion. He took the slaves of his intestate, and worked them in co-partnership with a third person, on a plantation not his own, from the year 1859 till they were emancipated; and yet, it not having been shown that he set up title in himself, or that his control of them necessarily defeated the claim of the estate to them, or that they were lost to the estate by any direct abuse, by sale or embezzlement, or by any mal-administration, or by any neglect on the part of Vasser (but, because they were lost to the estate of Vasser's intestate *by emancipation,)* he was held not to be chargeable as having converted them—a ruling which is supported by a long list of authorities there cited.—See *Rand v. Oxford,* 34 Ala. 417; *Freeman v. Scurlock,* 27 Ala. 413.

PETTUS, DAWSON & TILMAN, *contra.*—The jury found that Saltmarsh assented to the legacy, and set apart and allotted the negroes as the property of the plaintiff under the same. By these acts the legal title thereto was divested of the executor and vested in appellee.—*Mordecai v. Beal*, 8 Port. 529; *Cox's Adm'r v. McKinney*, 32 Ala. 461; Will. on Executors, vol. 2, p. 1182.

The character of Saltmarsh's possession was, therefore, changed. Before this he held them *as executor;* but thereafter his possession of these slaves was *in the nature of a trust or bailment* for the benefit of the appellee, the terms and considerations of which were unmistakably fixed by law.

Appellee being then a minor, Saltmarsh could discharge himself of his *quasi* trust only by delivery to appellee's legally constituted guardian.—Will. on Executors, vol. 2, p. 1206; Red. on Wills, part 2, pp. 574–5; Roper on Leg. vol. 1, p. 789, *et seq.*

Appellee's father, though his natural guardian, had no authority to receive them; nor was the executor authorized by law to deliver them to him.—*Alston v. Alston*, 34 Ala. 15; *Isaacs v. Boyd*, 5 Port. 388; Will. on Executors, *supra;* Red. on Wills, *supra;* Roper on Leg. *supra.*

Nor did he free himself from liability to appellee by delivering them to his father.—Authorities *supra; Lang v. Pettus*, 11 Ala. 37.

Having delivered said slaves to appellee's father, Saltmarsh would not have been allowed to avoid the disposition of them and recover them.—*Lawson's Adm'r v. Lay*, 24 Ala. 184, and authorities cited.

Whatever may have been his *intention* in thus disposing of them, the *fact* and the *consequences flowing therefrom* remain the same. His duty, under the law, was to preserve the slaves during the minority of appellee, or until a guardian should be appointed for him, and then deliver them over; but he, by this disposition, disabled himself from carrying out and performing these mandates of the law, having irrevocably lost the possession and control of them. His power, thereafter, over these slaves was no greater than that of any stranger.

The delivery of the slaves by Saltmarsh to appellee's father was, therefore, unauthorized, and a breach of the trust reposed in him by law. It was, therefore, a conversion.—*Lawson's Adm'r v. Lay*, 24 Ala. 184–7; *Murray v. Burling*, 10 Johns. 172; Hill on Torts. vol. 2, p. 106, § 7; *Barwick v. Rackley*, 46 Ala. 402–9; *Gerald, et ux v. Bunkley*, 17 Ala. 170–7; *Tomkies v. Reynolds*, 17 Ala. 109–17; *Morgan, Adm'r, v. Nelson, Adm'r*, 43 Ala. 586; *Tucker and Wife v.*

*Magee,* 18 Ala. 99; *Bullard v. Young,* 3 Stew. 46, and authorities cited in brief of counsel; *Ala. & Tenn. R. R. R. Co. v. Kidd,* 35 Ala. 209–20, and authorities cited; 2 Green. on Ev. § 642, p. 531; 1 Chitty's Pl. m. p. 155; 4 Phil. on Evi. p. 22–4–5, Part II; Angel on Carriers, § 432, p. 375; *Holbrook v. Wigat,* 24 Wend. 169; *Esmay v. Farming,* 9 Barb. 176.

It will be observed on an examination of the above authorities, that a mere *non-delivery* by a bailee, no demand being made, or a mere *non-feasance* on his part, does not constitute a conversion; but if the bailee is an *actor* and delivers the chattels to the wrong person, *though by mistake,* trover will lie.

Again: Our supreme court have defined a conversion to be, or rather have decided that the term embraces "any intermeddling with or dominion over personal property, *subversive of the dominion of the true owner, or of the nature of the bailment.*"—*Freeman v. Scurlock, et al.* 27 Ala. 413; *Rand v. Oxford,* 34 Ala. 477.

Taking the above as an exhaustive definition of a conversion, Saltmarsh was guilty thereof. For his delivery of the slaves to appellee's father was subversion both of appellee's dominion over the slaves and also of the nature of the bailment under which Saltmarsh held the slaves.

We submit the following citations and authorities to show what acts constitute a conversion:

Where an agent, instructed to sell a horse, exchanges it, and the like, the act is a converson.—*Ainsworth v. Partillo,* 13 Ala. 460; *Glaze v. McWilliam,* 7 Port. 279; *St. Johns v. O'Connel, ib.* 466; *Gray v. Crocheron,* 8 Port. 191; *Wheelock v. Wheelwright,* 5 Mass. p. 104, *vide,* 3 Pick. 492; 5 Duer, 49; 6 Duer, 257; 15 Gray, 306; 12 Pick. 135; 5 Hard. 228; 9 Barb. 176; 23 How. 345.

Legatee may bring trover for specific legacy, after assent by executor, the executor delaying to deliver it.—*Williams v. Lee,* 3 Atkyns, m. p. 223.

F, being guardian of plaintiff, and in his right having possession of slaves, died, and H was appointed his executor, H knowing that the slaves belonged to the infants, hired them for one year, and took notes for the hire, payable to himself. *Held,* a conversion.—*Dunsboro v. Hardy,* 4 Dev. (N. C.) 572.

MANNING, J.—Alanson Saltmarsh, appointed by Wm. R. King, late vice president of the United States, of Dallas county, deceased, executor of his last will and testament, assumed the duties of the office in May, 1853. Under a clause

in the will, appellee, Wm. R. King Beck, became entitled to some slaves, which, in January, 1854, when appellee was between four and five years old, and was residing with and under the protection of Franklin K. Beck, his father and natural guardian, in Wilcox county, the executor, Saltmarsh, turned over to the latter for the son, upon receiving from the father a receipt for them, signed "Wm. R. King Beck, by F. K. Beck, guardian." The slaves were taken to and remained upon the plantation of the father as the property of the son, until the death of the father in 1864, and continued thereon in the same manner until the emancipation of them by the event of the late war, and the public measures consequent thereon. Neither Franklin K. Beck, nor any other person, disposed of or claimed the slaves as the property of any other person than appellee. Nor does it appear that any person was ever legally appointed his guardian.

Appellee became of age in May, 1870, and a little more than two years afterwards he brought this action of *trover* against appellant as administrator of Saltmarsh, who was then dead, for the conversion of the slaves by the latter in January, 1854. And it is insisted that the facts mentioned constituted a *conversion* of the slaves by Saltmarsh. The court below held that they did; and a verdict was rendered in favor of appellee, plaintiff below, for several thousand dollars.

It is laid down as a general rule that, "where a legatee is an infant and would be entitled to receive the legacy, if he were of age, the executor is not justified in paying it either to the infant, or to the father, or any other relation of the infant, on his account, without the sanction of a court of equity.—2 Will. on Executors, 1206.

The cases from which this rule was deduced, were those of bequests of money, which, having been paid to the fathers of the legatees, respectively, was spent by them and lost to the legatees, and for which actions *ex contractu* were brought on behalf of the legatees.

In *Lang v. Pettus*, 11 Ala. 37, as in this cause, the legacy was of slaves, which the executor delivered to the infant legatee's father, who removed them from Alabama into Mississippi, and there sold and disposed of them, so that they were lost to the legatees. This court held that the executor was bound to account to the legatees for these slaves, in his settlement in the orphan's court, which granted to him the letters testamentary. It is clear that an executor remains responsible for property which comes to his possession as executor and is bequeathed to a legatee, until it is delivered to the legatee, or, if he be a minor, to his guardian, unless

[Nelson, Adm'r, v. Beck.]

otherwise lawfully absolved. He is not fully discharged from the duties of his trusteeship, as executor, until this is accomplished.

The cause before us is not from a probate court, or a court of chancery, in which defendant was proceeded against as the administrator of an executor, or of a trustee, accountable as such in those courts, to the appellee. The action is at law against the administrator of Saltmarsh, for a *conversion* by the latter of the slaves that King bequeathed to plaintiff below, appellee in this court. It proceeds upon the ground and idea that Saltmarsh, the executor, had assented to the legacy, whereby the legal title and right of possession were transferred to plaintiff, and that the subsequent dealing and control of Saltmarsh, in respect to the slaves, were not those of a trustee accountable in equity, and having authority as such, but of a mere bailee. The action assumes, and the counsel for appellee insist, that the slaves had become separated from the estate of Mr. King, that Saltmarsh's power over them as executor had ceased, and that there remained in him only the duty to take care of them, to be delivered whenever demanded, to the guardian of the plaintiff.

These are, indeed, the only views which are consistent with the form of the action. It is not adapted to hold the administrator of Saltmarsh responsible for any hires or profits that the latter received, or which it may be supposed he ought to have made the property bequeathed produce, or for any negligence or omission of duty, but only to recover the value of the property converted and damages for the *conversion*—for a *tort.* If the action be maintainable in this case, there having been no demand for, or refusal to deliver the slaves, it must be because any disposition by Saltmarsh of the slaves, which put them, no matter for how short a time, out of the reach of plaintiff, or his guardian, is a conversion. But this would be a conversion only because Saltmarsh became a mere bailee of the slaves, bound to deliver them on demand, when they were separated from the testator's estate, and then ceased to have the authority of an executor over them. The legatee was at that time a minor, and no guardian for him had yet been appointed; and no one seemed disposed to accept the office. What, then, was Saltmarsh, as such mere bailee, to do with the slaves which he held subject to be at any time demanded of him?

He may not have desired, and was not bound to employ them in working for himself, even if it had been proper for him to do so, and their labor would have been profitable to him. And not being guardian of appellee he had no authority to hire them out, if he could have advantageously done

(22)

so. He, perhaps, might, under the laws of this State, have procured the appointment of a legal guardian to the legatee, if he could have found any person willing to act as such, and then have safely delivered the slaves to such guardian. This would have been a prudent course. But it was not the duty of Saltmarsh to interfere, when the father and other relatives of appellee were living, and go to the part of the State in which they resided, to have such an appointment made. And whether it was or not, or, if he were neglectful of his duties in this or any other regard, the action brought is not a proper one for obtaining redress for any such delinquency. So far as this suit is concerned, the slaves must be considered as remaining in his hands as upon a bailment, to be delivered on demand.

Now, then, in what manner must Saltmarsh keep the slaves? Certainly not in his own house; or, where they could not be ever out of his view; not necessarily on his own premises. It is sufficient, if they be taken care of for the legatee and always as his, so that whenever demanded they shall be forthcoming to be delivered to him if he be of age, and if not, to his guardian, without the obstacle of any opposing claim.

Was there any time, before the emancipation of these slaves, when they were not in this situation of subjection to the demand of any legal guardian of appellee? The executor, with a view to the safe-keeping of them in the best manner, for the appellee and as his, let his father, his tenderest friend, take them into the neighborhood in which the son lived, and where, as he grew up, he would see and know them as his property; the father delivering to the executor a writing in which the ownership of the son is explicitly affirmed and acknowledged. The instrument and act did not, probably, release Mr. Saltmarsh from all liability. But it would be a strained interpretation, on the other hand, to hold that they were tortious toward appellee, hostile to his interest, or subversive of his rights. The effect of them was, it seems to me, to constitute Beck, the father, as agent of Saltmarsh, or in his place, custodian of the bequeathed property, for Beck, the son, and to make Saltmarsh responsible for the fidelity of this custodian. If the latter was true to his trust, did not put the property out of reach, or do any act subversive of the dominion of his son, then a lawful demand and refusal to deliver would have to be proved before Saltmarsh could be so put in the wrong as to be liable at law for a conversion of the slaves. It is not contended that any such demand was made.

It is argued, however, that the transfer of the slaves to the

father, who had not been appointed the legal guardian for his son, was itself a conversion, according to the rule cited *(supra)* from Wms. on Executors, and other authorities, and according to the principle of the cases in which a carrier, or other bailee, who, even by mistake, delivers the property of one person entrusted to him, to another to whom it does not belong, is made liable in trover for a conversion.

But, in the cases of the former class, the legacies were lost to the legatees by the acts, or bankruptcy of the persons to whom they were entrusted by the executors, and the actions against them were not trover without demand made. It would hardly be contended that if a legacy had been paid or delivered to the legatee while he was a minor, or to his father to be kept and taken care of for him, and had been well taken care of, and was in possession of the legatee when he became of age, or was then offered to him by his father, that he should, without anything more, recover the value of it again from the executor as for a conversion. And in the cases of the latter class, the goods bailed were delivered to others, not as the property of, and to be kept for the true owners, but as not theirs,—whereby the property was, no matter how unintentionally, or temporarily, put beyond their control, in violation of their rights.

But there is no conversion of goods for which trover will lie, unless there be a repudiation of the right of the owner, or the exercise of a dominion over them inconsistent with that right.—*Heald v. Carey*, 9 Eng. L. & Eq. Rep. 429.

Hence; it was held by all the judges of the English court of common pleas, that the following facts did not constitute a conversion: An agent at Dunkirk of a transportation company, found one of several cases of goods, which had been sent by plaintiff, Heald, from Paris to N. at London, damaged, and had it detained and inspected according to French law, and then, not knowing the address of N. in London, consigned it to defendant Carey, the broker of the company there, to hold at the disposal of N. or order. The case not being called for in due time, Carey paid the duty on it, and had it moved into the warehouse of B, and B afterwards had it removed to another of his warehouses, where it was burned by an accidental fire. In some of the features of this case it is similar to the one before us.

In Addison on Torts, the law is laid down as follows: A mere negligent dealing with goods by a bailee, to whom they have been delivered, is not a conversion of them. He may be liable to an action for negligence, but not to an action for conversion; which only lies where some dominion is asserted

by defendant over the chattel, the subject of the action."—
1 Vol. p. 306 of Amer. Ed. of 1876.

The same doctrine is held by this court. In *Rand v. Oxford*, (34 Ala. 477,) R. W. WALKER, J., says : "What is a conversion ? This court has answered this question by deciding that to constitute it there must be a destruction of the plaintiff's property, or some unlawful interference with his use, enjoyment or dominion over it, or an appropriation of it by the defendant to his own use, in disregard or defiance of the owner's rights."—*Conner & Johnson v. Allen*, 33 Ala. 515. In another case it was defined as any intermeddling with, or dominion over the property, subversive of the dominion of the true owner, or of the nature of the bailment, if it be bailed.—*Freeman v. Scurlock*, 27 Ala. 413. In *Conner & Johnson v. Allen, supra*, the court further say, that a disposition of a thing that is made "to do a kindness to the owner, and without any intention of injury to the thing, or of converting it to the use of the person disposing of it, and merely conservative of it and perfectly consistent with the right of the owner and his dominion over it," is not a *tort*.

Precisely of this nature was the disposition made by Saltmarsh of the slaves which are the subject of controversy in this cause.

In *Heald v. Carey*, above cited, a box of goods was consigned to defendant in London, subject to the disposal of one Nisbett there, which, not being called for in due time, Carey paid the duty on and put in a warehouse of another person, where it was burned by an accidental fire. In the course of his opinion in that case, JERVIS, C. J., said : "It is first said that he was not authorized in fact by the plaintiff to do what he did. But, if the goods were consigned to him, whether he had authority to pay the duty or not, he was authorized to put them in safe custody. Next, it is said that defendant did not act as a prudent man would have done. But, it is not necessary to consider that point, as that would not make him guilty of a conversion. Further, it is said that the defendant acted from indirect motives. But if a man acts, not wrongfully, though from improper motives, that does not make him guilty of a conversion."

MAULE, J., said : "The goods in this case were in the hands of the defendant, under condition to be held by him for plaintiff. He had something to do in respect of them. . . . . It was his duty to put the goods into a fit place; and it is not said that the place in which the goods were placed was not a fit one. I do not think there was any negligence, and there certainly was no conversion. There is no conversion unless the act is done in the assertion of

dominion over the goods." CRESSWELL, J., said: "How can it be said that he was a conversioner? He has never repudiated their right, or done anything inconsistent with his receiving the goods to take care of them. It is not said that he put them into a wrong place. He put them in a proper place for Nisbett to get them from. That was no conversion, or a conversion for the real owner." All the judges concurred.

Slaves, of course, could not be put into a warehouse. In fact, as well as according to the decision in *Rand v. Oxford*, *supra*, a plantation was a proper place on which to keep them. In the language of R. W. WALKER, J., in that case: "We must be presumed to know that moderate labor is not only promotive of the health of a slave, but essential to the preservation of that wholesome discipline on which his value so materially depends." These slaves were put, and kept, and remained on the plantation of appellee's father, as the acknowledged property of appellee, and for him, until his title to them was destroyed by irresistible political authority, no demand for them or refusal to deliver them having in the meantime been made.

To hold that the facts of this case constitute a conversion, seems to me a misuse of words that tends to make legal definitions uncertain, and rights and obligations indistinct. There never was a time until the emancipation of the slaves, when they were not held for plaintiff below, with his ownership of them acknowledged, and just where a guardian, if he had had one, could most easily have obtained them, and where it was apparently most advantageous to plaintiff that they should be. The first act done in defiance or denial of his dominion over them, was the act of emancipation, which annihilated his title; an annihilation from which there would have been no exemption, no matter where in the State or with whom the slaves might have been.

These views have failed to receive the acceptance of a majority of the court. They hold that the delivery shown of the slaves to appellee's father, was a conversion of them; and that there is sufficient evidence apart from that act, of the executor's assent to the legacy.

Wherefore, the judgment of the circuit court is affirmed.